**Cynthia J. FISHER, Plaintiff,**

v.

**VASSAR COLLEGE, Defendant.**

**No. 87 Civ. 4777 (CBM).**

United States District Court,
S.D. New York.

May 16, 1994.

As Amended June 30, 1994.

---

Eleanor Jackson Piel, New York City, for plaintiff.

Anderson, Banks, Curran & Donoghue by Maurice Curran, James P. Drohan, Mount Kisco, NY, for defendant.

## OPINION

MOTLEY, District Judge:

Plaintiff's principal claims in this action are that defendant discriminated against her on the basis of sex and age; that defendant discriminated against her in the terms and conditions of her employment; and that defendant retaliated against her for bringing this discrimination claim.

### A. INTRODUCTION

Plaintiff, Dr. Cynthia Fisher, brought this action against Vassar College under Title VII of the Civil Rights Act of 1964, as amended to apply to Universities in 1972 (42 U.S.C. § 2000e *et seq.*) alleging discrimination against her on account of her gender. The case was tried before the court commencing on June 14, 1993 and was completed on July 2, 1993.

Pursuant to the court's permission during the course of the trial (R. at 2392), plaintiff filed an amended complaint which made the following claims:

1. Plaintiff was discriminated against on account of her sex when she was denied tenure in May of 1985 in that male members

of the Biology Department Faculty who had fewer qualifications than plaintiff, both prior and subsequent to her denial of tenure, were granted promotion to Associate Professor rank and tenure;

2. She was discriminated against in the denial of promotion and tenure on account of her status as a married woman;

3. During plaintiff's employment as an Assistant Professor of Biology from 1977 through June 1986, she was paid less in salary than men Biology faculty with similar assignments in violation of Title 29 U.S.C. § 206(d)(1);

4. Plaintiff was discriminated against on account of her age when she was denied promotion and tenure in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; and

5. Plaintiff suffered retaliation from defendant in violation of 42 U.S.C. § 2000e–3 in connection with a new position on the Bard College faculty which she secured after leaving Vassar.

Plaintiff seeks monetary damages, reinstatement on the faculty at Vassar with tenure and attorneys' fees and costs.

## B. FINDINGS OF FACT

After hearing the evidence and weighing the testimony, exhibits received in evidence and the credibility of the witnesses, the court makes the following findings of fact:

1. Plaintiff, Dr. Cynthia Fisher, is a married woman with two daughters ages 27 and 24. She holds a Bachelor's degree from the University of Wisconsin and Master's and Ph.D. degrees in Zoology from Rutgers University. (R. at 20.) She engaged in post-doctoral studies at Rutgers Medical School from 1963 to 1965. Between 1974 and 1976, she taught biology as a part-time lecturer at Marist College in Poughkeepsie, New York. (Pre–Trial Order, II, E., 1; Exh. 7.)

2. Defendant, Vassar College, is an employer within the meaning of Title 42 U.S.C. § 2000e–2.

3. Plaintiff was employed by the defendant from 1977 through 1986 as a member of the Biology Department Faculty. (R. at 22; Exh. 113.)

4. On March 29, 1985, the Vassar College Biology Department senior faculty recommended by letter to the Dean that Dr. Cynthia Fisher be denied promotion and tenure on the grounds that she did not demonstrate "the outstanding quality called for in the 'Guidelines for Appointment, Reappointment and Promotion of Faculty at Vassar College' as set forth in the Faculty Handbook." (Pre–Trial Order, II, F., 6; Exh. 8.) The letter was confidential and, therefore, not seen by plaintiff until discovery in this action. (R. at 241.)

5. Dr. Fisher was informed of this decision on March 29, 1985, during a twelve-minute meeting with the Chairman of the Department, Leathem Mehaffey. Although Dr. Mehaffey had been delegated to explain to Dr. Fisher the Department's conclusions and reasons for recommending against tenure, he refused to discuss the Department's decision in any detail. (Exh. 98B.) Dr. Fisher received no further explanation of the Tenure Committee's position from the Biology Department, the Dean, the President or anyone else at Vassar. (Pre–Trial Order, II, F., 6; Exh. 98A–C.)

6. The Departmental letter recommending against promotion and tenure for Dr. Fisher denigrated her scholarship, teaching ability and service; the three criteria considered on review. (Exh. 8.) The negative recommendation was unanimous as were all seven tenure recommendations made by the Department from 1979 to 1985. In 1987, a Dr. Schlessman was recommended for tenure in Biology by a 4–3 vote. (Exh. 24, 29, 32, 36, 39, 43, 117.)

7. Departmental recommendations are forwarded to the Dean and to the Faculty Appointments and Salary Committee (FASC) and each makes an independent recommendation. The Dean and the FASC then meet and compare their recommendations. Afterwards, they meet with the President of the College, who has also made an independent review and come to a final decision. (R. at 1424–25.)

*Qualifications for Tenure.*

*Scholarship.*

8. The components of the "scholarship" qualification for tenure include peer-reviewed journal publications, the eminence or rank of the journals in which such publications appear, peer-reviewed extra-mural research grants awarded directly to the investigator (as distinguished from fellowship money), professional consultantships to national research institutions, papers presented at professional meetings with abstracts published, extra-mural research appointments, other in-house grants or fellowships and other lesser components.[1] (R. at 839–41, 1113–15, 2196–97; Fallding Dep. at 25–26.)

*Publications.*

9. At the time of her tenure review, Dr. Fisher had seven peer-reviewed publications: six research papers plus an invited chapter. She also had a completed manuscript which was submitted in her dossier to the Biology Department and was subsequently published. Of these eight papers, three were pre-Vassar, and five were based on work done since she started at Vassar in 1977. She was second author on her first publication, and sole or principal author on all seven subsequent papers, including all five published while at Vassar. These publications were:

Leathem, J.H. and Fisher, C.J., Pregnancy and Protein Nutrition. V Congresso Int. per la Riproduzione Animale e la Fecondazione Artificiale Bol. III: 274–276, 1964.

Fisher, C.J. and Leathem, J.H., Effect of a Protein-free Diet on Protein Metabolism in the Pregnant Rat. Endocrinology 76: 454–462, 1965.

Fisher, C.J. and Stetten, M.R., Parallel Changes *in vivo* in Microsomal Inorganic Pyrophosphatase, Pyrophosphate–Glucose Phosphotransferase, and Glucose 6–Phosphatase Activities. Biochem. Biophys. Acta 121: 102–109, 1966.

Fisher, C.J. and Sawyer, R.H., The Effect of Triamcinolone on the Development of the Bursa of Fabricius in Chick Embryos. Teratology 22: 7–12, 1980.

Fisher, C.J., Chick Embryos in Shell-less Culture. In: "Tested Studies for Laboratory Teaching: Proceedings of the Fifth Workshop/Conference of the Association for Biology Laboratory Education (ABLE)." Kendall/Hunt Publishing Co., Dubuque, Iowa. R. Ecklund, Ed., in Press, 1984.

Fisher, C.J., W.M. O'Guin and R.H. Sawyer. Altered Keratin Biosynthesis Follows Inhibition of Scale Morphogenesis by Hydrocortisone. Developmental Bio. 106: 45–52, 1984.

Fisher, C.J. and R.H. Sawyer. Comparison of Hydrocortisone and Triamcinolone Inhibition on Scale and Feather Development. Teratology 33: 37–45, 1985.

The unpublished manuscript entitled "Vitamin–A–Induced Ptilopody Alters Keratin Biosynthesis," the logic of which was criticized by the Biology Department (Exh. 8) was subsequently published under the authorship and title: Fisher, Knapp and Sawyer, "Retinoic Acid Reticulate Scales." Teratology 38: 321–328, 1988.

(Exh. 7I, BH, 7 IV A, 58E–F, 130A.)

10. The *Science Citation Index (S.C.I.),* published annually by the *Institute for Scientific Information,* establishes a standard for grading the importance of professional journals in which scientists' works appear. (R. at 1100–03.) The *S.C.I.* gives the citations to each author's past articles and the number of citations each year to over 4000 scientific journals published worldwide. The journals are then ranked in an annual volume called the *S.C.I. Ranking Index* from most-cited (number 1) to least-cited. The top-ranked five percent are those journals ranked from 1 to approximately 200. The frequency of citations of a scholar's work as listed in the *S.C.I.* and the rank of the journal in which

1. A comparison of the pre-tenure scholarship record of Dr. Fisher with the records of the men tenured in Biology prior to 1985 are summarized in Exhibit 77 and show her record to be superior. Both Drs. Mehaffey, (R. at 1515–17), and Suter, (R. at 2419–22), claimed at trial that Exhibit 77 had omitted several components of their scholarship, but gave no documentation to support their claims. Dr. Suter admitted that none of the documents he claims was omitted was listed in his Curriculum Vitae.

the work was published are key measures of scholarship familiar to scientists and widely used by them. (R. at 1100–1115.) Dr. Fisher was published in some of the most prestigious journals and was more often the first author which is meaningful with regard to credit. (R. at 1109–10, 1113–14; Exh. BH.)

11. Among scientists, the number of citations to an article and the rank of its journal are a combined index of the importance of the work. The court has reviewed relevant pages from the *S.C.I.* for citations to Drs. Fisher, Hemmes, Mehaffey, Suter (three males) and Norrod (single female) and has further checked, with the help of expert testimony, the total numbers of citations in the *S.C.I.* to the pre-tenure, peer-reviewed publications of doctoral or post-doctoral research for Dr. Fisher and for Drs. Hemmes, Mehaffey, Suter and Norrod, the four recipients of tenure during the period Dr. Fisher was on the faculty to whose records Dr. Fisher's record must have been compared, as well as for Dr. Mark A. Schlessman, the male who was granted tenure in 1987. The court has made the following comparisons as to these journal publications and their comparative importance. (Exh. 108A, 108BB, 108CB; R. at 218–219, 1103–1115):

a) Dr. Fisher had 50 citations to her papers in top five percent journals (ranked 7 to 109) and four citations to a paper in a 766 rank journal. (Exh. 7I, 77 p. 6, 108BB, 108C; R. at 223–24, 1103–1115.)

b) Dr. Norrod, a single female granted tenure on the recommendation of the Biology Department the year that Dr. Fisher was turned down, had 39 citations to her papers in top five percent journals (ranked 19, 70) and 31 citations to journals ranked 236 to 1,406. (Exh. 73, 78B pp. 4–5, 108BB; R. at 212–18.)

c) Dr. Suter, a male who received tenure in 1984 had no citations to papers in top five percent journals and had 26 citations to journals ranked 428 to 3340 out of 4000.

(Exh. 69, 77A pp. 4–5, 108BB, 108CA; R. at 211–13.)

d) Dr. Mehaffey, a male who received tenure in 1980, and chairman of the Biology Department in 1985 at the time Dr. Fisher was considered for tenure, had no citations to top five percent journals and had five citations to one article in a journal ranked at number 296. At the time of his tenure review, he had five published papers and was first author on only one of them. All these papers were based on pre-Vassar work. At the time of tenure review, he had one paper published from his six and one-half years of work at Vassar and was second author. (Exh. 67, 77A p. 3, 108BB, 108CA; R. at 211–13, 1108–09.)[2]

e) Dr. Hemmes, a male who received tenure in 1979, had 21 citations to one article in a top five percent journal which was ranked at number 75. (Exh. 65, 77 p. 2, 108BB, 108CA; R. at 211–13.)

f) Dr. Schlessman, a male who received tenure in 1987, did not have any citations to top five percent journals and had six citations to a journal ranked 2634th. His other publications were in journals not listed in the *S.C.I.*, and, therefore, are not counted. (Exh. 124, 77 pp. 8–9, 108A, 108BB, 108CA; R. at 211–13.)

12. The court finds, based on the evidence, that Dr. Fisher's publication record in prestigious journals was superior to that of the three males who received tenure prior to the consideration of Dr. Fisher for tenure and the male who received tenure subsequently in 1987 and was relatively equal to that of the single female who was promoted.

13. As part of its negative tenure recommendation, the Biology Department Committee falsely stated to FASC that the journals in which Dr. Fisher had published were "less impressive" than those in which Dr. Pinina Norrod, an unmarried female granted tenure the year Dr. Fisher was turned down, had published. (Exh. 14.) While a major portion of Dr. Fisher's publications appeared while

2. At trial, Dr. Mehaffey claimed that he had 28 citations and that Dr. Fisher had only five. (R. at 1518–19.) He reached this conclusion by counting for himself citations to papers which had been published from pre-Vassar work done at Harvard and on which he was not first author

and where he was not even listed in the *S.C.I.* due to the fact that he only played an assisting role (first authors were Drs. Berson and Rabin). (Exh. 66.) In his count and comparison, he omitted Dr. Fisher's pre-Vassar work where she was listed in the *S.C.I.* as first author. (Exh. 7.)

she was teaching at Vassar, all of Dr. Norrod's publications were pre-Vassar. (R. at 1051–52.) There had been no break in Dr. Norrod's career as there had been in Dr. Fisher's. (R. at 1062.) Furthermore, in proceedings before the FASC regarding Dr. Fisher's tenure which took place two months after the Department had made its recommendation, (Exh. 8), the FASC noted that Dr. Fisher's research was performed "under more difficult circumstances than [Dr.] Norrod['s] [and was] somewhat wider in range." (Exh. 14; R. at 2148–2150, 2172.) Therefore, even if Dr. Norrod's publication record was considered to be more impressive than Dr. Fisher's record, her success was achieved without the extra burdens Dr. Fisher faced as a professor of biology.

14. In continuing its criticism, the Department stated to the FASC that the journals in which Dr. Fisher had published "were fairly narrow and highly specialized." (See Glen Johnson Dep. at 15; Exh. 14.) However, in 1984, the Department did not remark on the journal rankings of Dr. Suter's publications or comment on the breadth or narrowness of his research which was exclusively on spider behavior. (Exh. 32.)

15. Dr. Fisher's published research had major importance to other scientists and was the opposite of "narrow and specialized." The three outside experts who evaluated Dr. Fisher's scholarship for Vassar's tenure review process commented that her work was: 1) important to other scientists working on "skin biology, genetics, cellular and developmental biology and mechanism of teratogenesis (birth defects)," (Exh. 12C p. 2); that 2) "her papers are published in well-respected and refereed journals," (Exh. 12C, p. 1); and 3) that her work "has made an important contribution to the study of development in the skin," which "may have important implications to other areas such as cancer research . . . ." (Exh. 12B, p. 1.)

16. The practice in science and among scientists in producing major research papers is to collaborate with other scientists. The first author on a multi-authored paper is the principal investigator, with the other listed authors having supporting roles. The S.C.I. cites the first author. (Exh. 108A; R. at

1109–10.) The Biology Department represented that Dr. Fisher's research was derived from collaboration and was therefore not self-directed. (Exh. 8 p. 5 ¶ 3, 14 p. 2.) These conclusions were without foundation in fact. Dr. Fisher's published collaborative papers all resulted from projects she designed and carried out. (R. at 259–64, 852–53; Exh. 7–IV–G.) Moreover, Dr. Fisher's independence as a scholar was further confirmed by her being awarded a number of National Science Foundation (NSF) grants as sole or co-principal investigator while at Vassar. (Exh. 7I; R. at 253–56.)

17. Dr. Fisher's research independence may be contrasted with that of Drs. Hemmes and Mehaffey by comparing her number of first authorships with theirs. (Exh. 7, 64, 66; summarized in Exh. 77.) While Dr. Fisher was first author on five collaborative papers, Drs. Hemmes and Mehaffey were first authors on only one paper each at the time of their tenure reviews.

18. Moreover, both Drs. Hemmes and Mehaffey were praised on tenure review for their extra-mural collaborations. (Exh. 24, 29.) In addition to praising the quality of these collaborations, the Biology Department went far to excuse the lack of publication which resulted from these collaborations. (Exh. 24, 29.)

19. Without any support in the factual record, the Biology Department recommendation letter questioned the quality of Dr. Fisher's scholarship by, among other things, criticizing five of her papers. The letter stated, "[w]e have serious questions concerning the quality of the scholarship,"—her work was "purely descriptive" and made "no interpretive claims." (Exh. 8 p. 3 ¶ 5.) Dr. Castellot, an expert witness, noted that one of Dr. Fisher's papers was important in its demonstration that a chemical used in humans to treat a number of diseases could cause birth defects. (R. at 1119.) Another paper addressed possible regulatory mechanisms in chick scale development. (R. at 1121.) However, the Biology Department Tenure Committee only considered the paper "a good experimental report," and concluded that Dr. Fisher was "dependent on her co-authors" in her work. (Exh. 8 p. 4 ¶ 1.) The

Committee also concluded from her colloquia presentations, presentations required by the Biology Department for untenured members in a review year, that she "lacks both understanding and expertise" and "does not understand" the "significance [of her work] to [its] interpretation." (*Id.*) As there were no indications of her inability to understand her work in this paper, the court finds that the Department's criticism of this paper made unwarranted assumptions, was not based on any scientific rationale, and baselessly stated that she did not understand the biochemistry involved. (R. at 1122–23.) The criticism of a third paper stated that the paper represented unsound experimental thinking. (R. at 1125.) But in light of the fact that the Department did not carry out a statistical analysis of the experimental design, the criticism was again unwarranted. (*Id.*) The Department avoided dealing with the significance of the work which showed the higher potency of one chemical than another in the development of chick scales. (R. at 1127.) As to the fourth paper, the Committee opined that "[t]he logic by which she derives this interpretation is impossible to follow." (R. at 1128.) The Department again made unwarranted critical remarks and failed to check the substance of a reference in the paper which would have answered the questions the Department had concerning the dosage used in that particular experiment. (R. at 1127–31.) As to the fifth paper, the Department failed to acknowledge the value of the paper to research laboratories. Additionally, the Department unduly criticized her work for being based on a high school student's project instead of acknowledging that science always involves input from many people with each person often profiting from the work of others. Therefore, all improvements made by a person on others' work are significant scientific developments. (R at 1132–35.) These comments about Dr. Fisher's work had no foundation in fact, (Fallding Dep. pp. 51–53, 59, 65–67), and clearly demonstrate bias against Dr. Fisher and the pretextual nature of the recommendation against her.[3] Each of the papers published,

or accepted for publication by journals, had already been reviewed by several neutral expert scholars serving as editors of the respective journals. Papers submitted with the kinds of defects described by the Committee's letter are seldom published by these prestigious journals. (R. at 891–898, 1115–1144; Fallding Dep. pp. 169–174, 205.) The Biology Department Tenure Committee's representation that these journals were not "top rank" was pretextual and made in bad faith since the members of the Committee, all of whom are biologists, were familiar with the standards of the *S.C.I.* and the rankings of the journals in which Dr. Fisher had published since the *S.C.I.* is well recognized among scientists and science teachers. (R. at 1100–10.) Even without any study of the *S.C.I.*, the Committee should have been aware of the eminence of the journals in which Dr. Fisher published. Moreover, the Department could not in good faith have believed that Dr. Fisher's work was more narrow and specialized than Dr. Suter's work on spider behavior, for which he was commended in the Department's recommendation for his promotion and tenure the previous year, (Exh. 32), or that Dr. Fisher's work was less important than that of Drs. Mehaffey and Hemmes. (R. at 891–898.)

20. Dr. Fisher's published research was commended, without reservation, by all three outside evaluators who evaluated Dr. Fisher for tenure review, by three expert witnesses at trial (two live witnesses, (Drs. Harding and Castellot) and one by deposition (Dr. Fallding)), and implicitly by the dozens of peer experts who reviewed and approved her published papers and her funded research grants. The only criticism of Dr. Fisher's scholarship came from Vassar's Biology Department. Generally, less weight is given to faculty opinion within a department than to outside experts since it is the outside experts who presumably know the field better. (Fallding Dep. pp. 169–173.) The court notes that Vassar offered no expert witnesses to counter the expert testimony adduced by plaintiff.

**3.** Similar testimony supporting the importance of each of the five Fisher articles criticized by the Department was given by Dr. Fallding who is an expert in skin teratology. (Fallding Dep. pp. 45–47.)

21. The Court finds that the Biology Department's conclusions concerning the journals in which Dr. Fisher had published and the other comments the Department made about her published works in its assessment of her for tenure were disingenuous, pretextual and clearly made in bad faith, particularly in light of the fact that the persons making the statements concerning the assessment knew the false premise on which the conclusions were based.

*Grants.*

22. Further on the issue of scholarship, the court has reviewed Dr. Fisher's record concerning extra-mural, peer-reviewed grants and has found that at the time of tenure review, Dr. Fisher had the following grants:

(a) *Research Grants:* (the last four were obtained during Dr. Fisher's teaching career at Vassar)

NSF Co-op Graduate Fellowship, 1961–63 (Exh. 7I)

American Association of University Women (AAUW) Fellowship, 1961–62 (Exh. 7I)

National Institutes of Health (NIH) Post-doctoral Fellowship, 1963–65 (Exh. 7I)

NSF Small College Faculty Opportunity Award, 1979 ($3,900) (Exh. 7I, 61H, 7 IV B)

NSF Scientific Equipment Grant, Principal Investigator, 1981 (No. 8109084: $18,-480) (Exh. 7I, 7 IV B, 61G)

NSF Research at Undergraduate Institutions Grant, Principal Investigator, 1984–86 (PCM–8402332: $40,000) (Exh. 7I, 61A, 7 IV B)

NSF Research Grant, Co–Principal Investigator, 1984–87 (PCM–8402104: $204,-000*) (Exh. 7I, 61E, 7 IV B)

(b) *Research Equipment for Teaching Grants*

NSF Instructional Scientific Equipment Program Grant for Physiology Laboratory at Marist College, Co–Principal Investigator 1976 ($12,000*) (Exh. 7I, 61I)

NSF ISEP Grant for Tissue Culture Laboratory, Vassar College, Principal Investigator, 1980 (SER 8014038: $12,500 *) (Exh. 7I, 61F.)

* There are discrepancies concerning the monetary amounts of these three grants. The amounts as listed above were taken from Dr. Fisher's Curriculum Vitae (Exh. 7I.) However, the amounts listed in exhibits 61E, 61I and 61F are $145,000, $6,000 and $6,256 respectively. It is unclear whether there were amendments to the grants which would explain the differences in these amounts.

(c) *Vassar College Intra–Mural Grants*

1979 Beadle Fund Grant (Exh. 60P.)

1979 Mellon Grant for Faculty Development (Vassar College) to attend Scanning Electron Microscopy course at SUNY, New Paltz (Exh. 60W.)

1980 Beadle Fund Grant (Exh. 60Q.)

1980 Mellon Grant for Faculty Development (Vassar College) to attend Transmission Electron Microscopy course at SUNY, New Paltz (Exh. 60BB.)

1981 Beadle Fund Grant (Exh. 60S–T.)

1981 Mellon Grant for Faculty Development (Vassar College) to set up an "in house" Photomicrography Course ($2,000) (Exh. 60EE–FF.)

1983 Mellon Grant for Faculty Development (Vassar College) for Microscopy Course, M.B.L., Woods Hole, MA ($1,014) (Exh. 7I.)

1983 Beadle Fund Grant (Exh. 7I.)

1984 Mellon Grant for Faculty Development: Research at U. of Grenoble, France ($1,470) (Exh. 7I.)

23. The Biology Department Committee, in its negative tenure recommendation, minimized the importance of Dr. Fisher's many grant successes. The Committee incorrectly stated that one of her grants was secured only after five unsuccessful attempts. (R. at 253–54.) While it noted that having to make several attempts is not unusual due to the competitiveness of securing national grants, the Committee misrepresented the facts. (Exh. 8 p. 3 ¶ 1.) This grant was in fact accepted on the fourth revision. (R. at 1833–34.) In addition, the Department down played the importance of Dr. Fisher's Research in Undergraduate Institutions (RUI) grant by incorrectly calling it "less competitive" than regular grant programs when, in actuality, RUI grants are considered equally

as competitive. (R. at 857–58, 254; Exh. 8 p. 3 ¶ 1.) The Departmental letter even criticized the soundness of Dr. Fisher's funded grant applications implying that the expert peer reviewers for these highly competitive national awards were somehow remiss in failing to spot the defects in her work which the Vassar Biology Department was able to discover. (Exh. 8 p. 5 ¶ 2.) Research grants are awarded by the NIH and NSF under extremely competitive circumstances and only after intensive review by a panel of expert peers in the scientific discipline of the person submitting the grant. (R. at 857–58, 860–61; Fallding Dep. pp. 47, 70–73.) These criticisms were in sharp contrast to recommendations made concerning the three male candidates who had been granted tenure while Dr. Fisher was on the faculty. (R. at 892; Exh. 8, 24, 29, 32.) None of these candidates was directly awarded any extramural peer-reviewed research grants while at Vassar College.[4] (Exh. 64, 65, 67, 68, 69, 77.) Dr. Schlessman, a male who was tenured in 1987, had one peer-reviewed research grant from a private foundation, the Research Corporation. (R. at 891; Exh. 124.)

24. It is significant that each of the three named male candidates, in the tenure recommendations of the Biology Department at the time of their tenure review, prior to the review of Dr. Fisher, were excused for not obtaining a funded peer-reviewed grant while Fisher's success in obtaining grants was minimized. (Exh. 24, 29, 32.)

25. The Committee belittled the prestige of Dr. Fisher's grant at the University of South Carolina, which she shared with Dr. Patricia DeCoursey, as co-principal investigator, by stating that "it was not related to her major research interest." (Exh. 8.) This conclusion was erroneous, in fact, since Dr. Fisher's collaborative work with Dr. DeCoursey applied Dr. Fisher's culture technique from Developmental Biology to a behavioral field and to study of the brain. (Exh. 61E; R. at 860–61, 255, 558–59.) Moreover, the Department's inference that a co-principal

investigator is less important is "not at all" true. (Fallding Dep. p. 79.)

26. On one NSF grant, "Effect of Adrenal Steroids on Scale Morphogenesis and Keratin Biosynthesis," the Committee misrepresented the record with respect to a letter from Dr. Fisher to Dr. Poodry (the Poodry letter), the Program Director of Developmental Biology at the NSF, in which she enclosed the NSF's assessments on unsuccessful grant applications to show how she had addressed the criticisms therein. Despite the fact that the revised application won the sought after grant, the unfavorable Departmental recommendation quoted language from these unfavorable grant reviews. (Exh. 62A.) The Committee commented that "several flaws . . . not mentioned in the reviewers' comments" in the funded proposal put the Committee in disagreement with NSF which found no weaknesses when it awarded the grant. (Exh. 8 p. 5 ¶ 2; R. at 110–116 581–587, 591, 876–879.) The Poodry letter was part of a revised and renewed application for the grant. The court finds the Committee's quotation of language from the Poodry letter and the attached reviews in its recommendation to be purposeful dishonesty. More specifically the court finds the dishonesty purposeful in light of the fact that the misquotation came about because the chairman of the Department deliberately asked Dr. Fisher to remove clarifying excellent NSF reviews of her work and to leave the critical assessments of the unfunded grant proposals in her departmental file. (R. at 111.) In any event, the other senior members of the Department must have known that grants which receive only fair to good ratings, as the Department characterized her grants, are not funded. (R. at 1135–38.)

27. With respect to the successful grant proposal (Exh 61E) Dr. Fisher shared with her sister, Dr. DeCoursey, the Committee gave all credit to her sister despite the fact that Dr. Fisher was the co-principal investigator, implying that she should not be credited for any scholastic contributions to the project. (Exh. p. 5 ¶ 3.) Dr. Fisher was

---

4. At trial, Dr. Mehaffey claimed he had some grants for which he had not been credited on Exhibit 77, but he produced no documentation to verify this claim and admitted that they did not appear in either his Curriculum Vitae or in his tenure dossier. (R. at 1515–17, 1910–11.)

further criticized for talking about this proposal at her research colloquium because the research had not yet been "perfected." (Exh. 8 p. 3 ¶ 2, p. 6 ¶ 1.) This was a spurious criticism since her colloquium involved a review of the techniques she invoked to secure her grant proposal; which in this instance involved the application of methods she had previously used in another field. (R. at 558–59, 859–63, 1140; Exh. 8 p. 6 ¶ 1.)

28. The same 1985 Departmental Committee which belittled Dr. Fisher's NIH and NSF grants, strongly recommended Dr. Pinna Norrod. (Exh. 39.) In fact, the Department specially pled the necessity for Dr. Norrod's tenure that year in the face of the FASC's recommendation to deny her tenure. (R. at 1874; Exh. 9C.) Furthermore, the Committee emphasized the competitive nature of the grants Dr. Norrod had received and the "respect for her work in the larger scientific community" that such grants represent. (Exh. 39, p. 4.) The Committee recommended tenure for Dr. Norrod despite her having been on the Vassar faculty for only three semesters during which time she had no Vassar originated publications or grants. (R. at 1038–42.)

*Papers Presented.*

29. The court has found that at the time of tenure review, Dr. Fisher had delivered the following papers at professional meetings:

March 11, 1965: Fisher, C.J. and M.R. Stetten Parallel Hormonal and Dietary Induced Changes in Microsomal Inorganic Pyrophosphatase, Pyrophosphate Phosphotransferase and Glucose–6–phosphatase activities. Federation Meetings, Atlantic City, NJ.

After joining the Vassar faculty:

March 8, 1980: Fisher, C.J. and R.H. Sawyer Effect of TAC on the Development of the Bursa of Fabricius in the Chick Embryo. Society for Developmental Biology N.E. Regional Conference, Marine Biological Laboratory, Woods Hole, MA.

March 27, 1980: Fisher C.J. Mechanism of Action of Vitamin A. University of Maryland.

March 8, 1981: Fisher C.J. and R.H. Sawyer *In vivo* Effect of Vitamin A (Retinoic Acid) on the Development of Chick Skin. Society for Developmental Biology N.E. Regional Conference, Marine Biological Laboratory, Woods Hole, MA.

December 28, 1981: Fisher, C.J. and R.H. Sawyer Effect of Vitamin A (Retinoic Acid) on Chick Development *in ovum.* American Society of Zoologists, Dallas, TX.

March 19, 1982: Fisher, C.J., J. Gray and R.H. Sawyer Glucocorticoid Inhibition of Scutellate Scale Development by Hydrocortisone. Society for Developmental Biology N.E. Regional Conference, Marine Biological Laboratory, Woods Hole, MA.

December 29, 1982: Fisher, C.J., J. Gray and R.H. Sawyer *In Vitro* Steroid Binding in Chick Embryonic Scale Skin and Glucocorticoid Inhibition of Scale Formation. American Society of Zoologists, Louisville, KY.

March 18, 1983: Fisher, C.J. and J. Gray Heterogeneity of Glucocorticoid Binding Sites in Avian Embryo Skin. Society for Developmental Biology N.E. Regional Conference, Marine Biological Laboratory, Woods Hole, MA.

December 27, 1983: DeCoursey, P.J. and C.J. Fisher Circadian Timing: *In Vitro* Culture of the Suprachiasmatic Nucleus. American Society of Zoologists, Philadelphia, PA.

December 28, 1983: Fisher C.J. and R.H. Sawyer Beta keratin: A Biochemical Marker for Feather Differentiation. American Society of Zoologists, Philadelphia, PA.

July 5, 1984: Fisher, C.J. and R.H. Sawyer Altered Keratinization Follows Scale Inhibition by Glucocorticoids. ESCSB Congress, Grenoble, France.

December 27, 1984: Fisher, C.J. and R.H. Sawyer Mechanism of Action of Hydrocortisone on Scale Keratinization. American Society of Zoologists, Denver, CO.

(Exh. 7I.) Dr. Fisher presented twelve papers. Drs. Hemmes, Mehaffey and Suter

and Schlessman had each presented six to nine papers at such meetings. (Exh. 77B.) Dr. Norrod had one invited presentation. (Exh. 72.)

30. The Biology Department Committee noted that Dr. Fisher had been invited by the National Institutes of Health to present a paper on Morphogenesis which it conceded represented recognition "by the scientific community." (Exh. 8 p. 2 ¶ 4.) An expert testifying at trial asserted that this kind of recognition was "almost unheard of" for an assistant professor at a liberal arts college and was a great honor. (R. at 851.)

*Consultantships.*

31. At the time of tenure review, Dr. Fisher had the following consultantships to the NSF and the NIH:

1984–85:　NSF Panelist for College Science Instrumentation Program (CSIP)

1983:　NSF Workshop on government research support at small colleges

1983:　NIH: Developmental Biology consultant to Dr. G. Groos at the National Institute of Mental Health

(Exh. 7I, 58C.) All of these consultantships were during her time at Vassar.

32. Drs. Hemmes, Suter, Schlessman and Norrod did not have any consultantships. Dr. Mehaffey had one consultantship. (Exh. 72, 77B, 124.)

*Sabbatical Leave Activities.*

33. Although the Committee agreed that Dr. Fisher's sabbatical year was productive, the members criticized her sabbatical "leave activities" claiming that she spent only brief intermittent periods in the laboratory which raised concerns "about the choices she made in respect to how to spend her leave year." (Exh. 8 p. 6, ¶ 2.) However, during her sabbatical, Dr. Fisher spent nine months working in the laboratory, during which time she collaborated with four different groups, submitted eight grant proposals, six of which (including two NSF grants) were funded, published one manuscript, wrote one other, served as consultant to both the NSF and the NIH and presented papers at national and international meetings. (R. at 45–47, 717–722; Exh. 7 IV B lab, 7I, 16C 57A–B, 58A–F, 61A–E, 17.) These accomplishments made her sabbatical year far more productive than those of the three males who preceded her in tenure in the Department and more than the male who was tenured in 1987. (R. at 891–895; Exh. 65, 69, 124.) The Committee excused Dr. Mehaffey for his lack of scholarly sabbatical activity by commending him for serving on a college committee during his sabbatical leave. (Exh. 29 p. 14.) Great portions of the tenure letters for each of Drs. Hemmes, (Exh. 24), and Mehaffey, (Exh. 29), were devoted to excuses for their lack of scholarly results. Despite her many recent grants and publications, the Departmental letter on Dr. Fisher concluded that "[t]here is no sustained in-depth probing of her research problem, leaving us once again to wonder about her commitment." (Exh. 8 p. 6, ¶ 2.) This statement stands out starkly as another demonstration of the Department's bad faith since Dr. Fisher's scholarship was superior or at least equal to the scholarship of the three men and single woman who preceded her in receiving tenure as well as the man who subsequently achieved tenure in 1987. (R. at 841–853, 1107–1113, 1142–43, 1692, 1798–99, 1820, 1833, 1859–60.) Dr. Norrod, the single woman, did not take a sabbatical prior to her review. (Exh. 72.)

*Outside Evaluations.*

34. The court finds that the three outside evaluators, selected to evaluate Dr. Fisher's scholarship record, evaluated her record analytically and in detail, were strongly positive on her scholarship and supported her tenure candidacy. The court further finds that their appraisals of the plaintiff's merit as a scholar were improperly ignored by the defendant college in its final determination to deny plaintiff promotion and tenure in the Biology Department. The Department represented to the FASC and the Dean that Dr. Fisher's outside evaluators did not go into depth or detail about her scholarship and thus their recommendations were not of high quality. (Exh. 126.) This was a disingenuous and pretextual criticism of these evaluations. It is clear upon a comparative reading of Dr. Fisher's outside evaluations and those submitted for the men who had been recently tenured in Biology that Dr. Fisher's evaluations were both more detailed and more

unreservedly positive than those the men candidates received. (Exh. 12A–C, 25A–B, 30A–B, 33A–C.) At trial an expert testified on this issue:

> As someone who is an expert in that area, I would agree with the outside evaluators whose letters were quite clear on the issue of Dr. Fisher's research accomplishments that in fact she was a very accomplished, very independent, very well respected scientist who had contributed significantly to her own research field and showed every promise of continuing to do so in the future.

(R. at 1142–43.)

35. Particularly revealing on the issue of good faith were the remarks that Dr. Mehaffey, chairman of the Department at the time of Dr. Fisher's tenure review, made to the FASC concerning Dr. Fisher's outside evaluations. Dr. Mehaffey prepared certain notes for the meeting with the FASC on May 3, 1985. He wrote that Dr. Fisher's three affirmative recommendations from the outside scholars were, "not at all analytical," and that the Committee was "in fact disgusted with their quality." (Exh. 126; R. at 1935–36.)

36. The court concludes that different standards were applied to Dr. Fisher. The court bases its conclusion not only on the strongly positive letters of support Dr. Fisher received from the outside evaluators, but also on a comparison with the outside evaluations received by the three men who were tenured prior to Dr. Fisher's review; Drs. Hemmes, Mehaffey and Suter. Not one of these men had as favorable recommendations as Dr. Fisher had. Dr. Mehaffey had only two letters of evaluation rather than the normally required three. Dr. Hemmes and Dr. Mehaffey were each evaluated by someone who knew them personally or had been a mentor, teacher, colleague or friend, and their letters spoke from that vantage point rather that of a disinterested third party. The court's findings are as follows:

> Dr. Hemmes was evaluated by three outside evaluators. One, Dr. Eliot Stellar, a distinguished professor at the University of Pennsylvania stated that, based upon the "minor" papers Dr. Hemmes had published, he could not recommend Dr. Hemmes for promotion or tenure on the basis of his "scholarly accomplishment." Dr. Stellar further stated that Dr. Hemmes had not accomplished enough to merit his being "worthy of tenure at that time." (Exh. 25A.)

The second report by Dr. Ann Sullivan at Hoffman–La Roche Co. was complimentary but brief (one-half page), not analytical and had no in-depth commentary. (Exh. 25B.)

The only other evaluator for Dr. Hemmes, Dr. Hirsch, knew him personally and had collaborated with him. (Exh. 26.) Despite this, the Biology Department strongly urged the Dean to place great significance on Dr. Hirsch's recommendation. (Exh. 24 p. 5.)

Dr. Mehaffey was evaluated by two outside evaluators. The first, Dr. B.R. Wooten of Brown University, discussed four of Dr. Mehaffey's papers. He was impressed with one of them but said that Mehaffey's three publications on night vision were of "little scholarly interest" and that his "publication rate had been low" but that he showed "great promise." The other, Dr. Margaret Burns, was complimentary, but as Mehaffey himself noted, her evaluation was not particularly useful to the Department's review process and if he "were a member of the FASC and [ ] got that letter [he] wouldn't pay much attention to it." It also appears that Dr. Burns was personally acquainted with Dr. Mehaffey due to her references to him as a warm, sensitive, thoughtful human being. (Exh. 30 A–B, R. at 1943–45.) Typically mentors, friends and/or collaborators are not to write peer reviews for tenure. (See R. at 837.)

Dr. Suter was the only one of the three males evaluated by three outside evaluators, all of whom reported favorably on his work but in conclusive language. One favorable evaluation by Dr. William Eberhard of the University of Costa Rica was limited to observations on Dr. Suter's research on insects and mice. While generally complimentary, Dr. Eberhard found one of Suter's papers "weak" because "some important observations are lacking."

He did not make a recommendation as to tenure. A second outside evaluator, Dr. McClure, knew Dr. Suter from the University of Indiana where Dr. Suter had been a friend of the evaluator and/or a student in the evaluator's department although Dr. Suter did not work directly with her. Again, an evaluation by a person where this type of relationship exists between the evaluator and the candidate was not considered appropriate. (Exh. 33A–C.)

37. Despite the above record, Vassar's President Smith stated to Dr. Fisher that one of the reasons for her denial of tenure was that her outside "reviews were lacking strength as compared to those for other departmental decisions." (Exh. 128B p. 2.) President Smith could have been taking her cue from Dr. Mehaffey's characterization of the Fisher letter as "disgusting." (See Exh. 126.) The court finds that there were no consistent standards or criteria applied for the outside evaluations. (R. at 830, 834–53, 1033–42, 1045–65, 1142, 1151.) This is further proof of the pretextual nature and bad faith demonstrated in the decision against Dr. Fisher.

38. The court finds that the Biology Department Committee recommendation carried great weight in the subsequent deliberations of persons and committees appealed to by Dr. Fisher to reconsider the bad faith and pretextual negative recommendation concerning her promotion and tenure. A record of the FASC's meeting with the Dean and President Smith showed that there was discussion about the Department's strongly negative judgment of Dr. Fisher's research in light of her three outside evaluations which were more positive in tone than the Department's recommendations. It appeared to be of concern to the FASC that there was this disparity between the outside evaluators' and the Department's judgments. (R. at 2153.) The court finds that the FASC's, the Dean's and the President's final characterization of these outside evaluations as being superficial and not critical of Dr. Fisher's scholarship arose from points made by the Department such as Dr. Mehaffey's characterization of Dr. Fisher's evaluations as "disgusting." (R. at 2151–53, Exh. 126.)

39. It is significant that neither the President, nor any member of the FASC, nor the Dean were trained in the natural sciences and therefore were probably more reliant on the Biology Department's recommendation than they might have been in an application for appointment in another field such as the liberal arts. (Glen Johnson Dep. 14.) The President noted that the Departmental Committee's rejection of Dr. Fisher's qualifications for promotion and tenure represented "overkill" on the part of the Department. (Exh. 15.) This notation on Fisher's faculty record card made clear that the President of the College was aware of the pretextual nature of the Committee recommendation concerning Dr. Fisher, but she nonetheless went forward with the denial of Dr. Fisher's promotion and tenure.

*Standards Applied to Evaluate Scholarship of Tenure Candidates.*

40. One of Dr. Fisher's experts said that "different standards were being used in the case of Dr. Fisher" from the "standards being used for the other faculty members being considered." (Fallding Dep. p. 26.) Another stated the following:

> Dr. Fisher was very productive. There was no reason to assume that she was going to change overnight. She, despite enormous obstacles, had gone out there and gotten grants and more grants, and changed her research area and produced peer review publications and gotten collaborations and gotten consultantships. And as they say, they don't know if she's going to continue, yet when the men don't even produce a publication they say we know he's willing to make up for this in the future. It's a completely different story.

(R. at 898.)

41. One example of many in the record which demonstrates the arbitrariness of the application of standards and criteria is represented by a sample of the cross-examination of Dr. Pat Johnson, the former chairman of the Biology Department, who drafted the scholarship portions of Dr. Fisher's negative tenure recommendation.

> Q. Now on scholarship, and I'm turning now to page 3 of the report of March 28,

1979: "Mr. Hemmes has a broad scholarly interest in the nature of social communication in animals. His doctoral work centered on the maternal-infant bond and the kind of signals generated by mother and by infant which established and maintained that bond ..."

\* \* \* \* \* \*

Now, as of 1979, [the time of his tenure review] had Mr. Hemmes had any peer review publications while he was at Vassar?

A. Yes, he did.... It was a paper entitled—well, I don't remember the exact title, but it had to do with the reproductive capacity in Zucker genetically obese rats.

Q. And where was the paper published?

A. I believe in the proceedings for the society of Experimental Biology and Medicine.

Q. And did he have any other papers published?

A. As I recall, he had at least one paper published before he came to Vassar.

Q. No. I'm talking about at this moment.

A. At this time, I think that that was the one published paper. He had two additional papers, including the one we are referring to in this paragraph, that were submitted for publication.

Q. I want to be clear on it. He had a paper published while he was at Vassar?

A. Yes.

Q. One?

A. That's my memory, one.

Q. Now, did you write about his published works, and I'm referring to page 5: "In summary, while the quantity of his published works is not great, the quality of the papers written and of the studies completed is exceptionally fine. We are certain that Richard Hemmes possesses a keen analytical mind and a creative drive that will keep him immersed in scientific investigation throughout his career?"

A. Yes.

Q. You wrote that?

A. That's what we wrote.

Q. "The work that he completes is precisely done, well controlled, thoroughly analyzed and properly interpreted. It should always meet with success in the peer review process."

A. Yes it is.

Q. "We must also add that he has written several grants of various kinds in search of funds to support his work, a task that is comparable to producing a manuscript." Now what did you mean when you said that?

A. That the creative process, if you will, that goes into producing a grant request is essentially the same kind of creative process that goes into producing a manuscript. It's addressed to describing the kind of work one is going to do, rather than describing the kind of work one has done, but the intellectual input, the detail that has to be presented, the experimental design that is to be described and presented is all of the same nature and quality that goes into producing a manuscript.

Q. Would it be fair to say here, Dr. Johnson, that you were crediting him with a great deal of good scholarship because he had written a grant application even though it had not been funded or approved or thought to be excellent by his peers?

A. Well, we were crediting him with signs of good scholarship based on not only those grant proposals that he had written, but also with the manuscripts that we had for review published—

Q. No, I'm asking about this very language here: "We must also add that he has written several grants of various kinds in search of funds to support his work, a task that is comparable to producing a manuscript."

Now right there are you saying that he should be complimented for writing these grant applications even though they were not peer-reviewed and even though in peer review they were not given a very good or excellent mark and funded?

A. I can't say what kind of mark they were given. All I can testify to is to say they were not funded. And I'm saying

yes, that he should be lauded for having written these proposals, yes.

(R. at 1798–1801.)

42. Similarly, when Dr. Pat Johnson was cross-examined about what the Committee said about her endorsement of Dr. Mehaffey, she was asked: "Are you saying there that he really couldn't publish because he couldn't get the research funds to do his work?" She responded, "[t]hat's what we are saying, uh-huh." (R. at 1815.)

43. The fact that there were no consistent standards applied in making judgments concerning promotion and tenure was doubly emphasized in the testimony of Dean Sullivan, the Dean of Vassar College at the time of Dr. Fisher's tenure review. When asked to describe the test applied to Dr. Fisher in her tenure review in the light of Dr. Fisher's scholarship record as compared with the men who received tenure in the years immediately preceding her tenure denial, his response was:

> ... [A] tenure decision is not a quantitative analysis. It is a judgment call. It is a judgment based upon evidence as best one understands the evidence. And each case has its distinctive characteristics because each case is an individual case. There may be some matters of analogy, but beyond that, one can say very little.

> One is looking at the case as it is presented. One is examining the evidence presented, one is making a judgment based on that evidence, and it's not done then on a comparative basis ...

(R. at 2204.)

44. Despite Dr. Fisher's impressive record which was superior or equal to the scholarship of the four assistant professors (three men and one single woman) who received tenure between 1979 and 1985 and the one man who received tenure in 1987, the Committee stated, without any apparent basis for its conclusion, that her overall scholarship accomplishments were "mixed." (Exh. 8.) They credited her with "energy," but questioned her "independence" as a scholar and the "depth of the mastery of the field in which she was working." (Id.) Based on the foregoing testimony and evidence, the court finds that these conclusions concerning Dr. Fisher's scholarship were made in bad faith, were pretextual, and represented the application of patently discriminatory standards.

*Teaching.*

45. Dr. Fisher's classroom performance was never directly observed by any of the five senior Biology Department members who constituted her tenure committee. (R. at 83, 1899.) Accordingly, her teaching performance assessment was based almost exclusively on student teaching evaluations.

46. The Biology Department letter of March 29, 1985, (Exh. 8), regarding Dr. Fisher's tenure heavily emphasized the student course evaluations in its commentary on Dr. Fisher's teaching record, but misrepresented the facts concerning the 24 courses taught by Dr. Fisher from 1977 to 1985. The Committee selectively excluded favorable ratings and focused on the two courses in which Dr. Fisher had difficulties. (Exh. 8 p. 8 ¶ 4, 46 A–P, 49.)

47. In student evaluations, teachers are given a score from one to five by the students in their class, with five being the highest score. (Exh. 129A–B; R. at 84.) In addition to these evaluations, teachers receive assessments from the Student Advisory Committee ("SAC") and from a committee composed of Vassar biology majors. (R. at 89.)

48. The Dean of the Faculty, H. Patrick Sullivan, testified that a 70 percent average of fours and fives on student evaluations "would be considered a good statistic" and "in the good or superior category." (R. at 2147.) During the period that Dr. Fisher taught at Vassar, with the exception of two courses, her overall average of fours and fives was greater than 70 percent. (R. at 89; Exh. 46A–46P.)

49. The Committee reached its unfavorable conclusions as to Dr. Fisher's teaching record by applying different standards to her than were applied to other tenure candidates. The Committee distorted the numbers by counting only fives for Dr. Fisher while counting fours and fives for the other candidates to determine student evaluation rankings. (R. at 298–99, 1146.) Additionally, the

Committee emphasized a few critical comments about Dr. Fisher's teaching instead of noting the generally affirmative comments that were made by the student committees. (Exh. 46A–O.)

50. Prior to tenure review in 1985, the Dean's Office produced the student evaluations for Dr. Fisher in 21 of the 24 courses she had taught up to that point. In total, there were 411 student responses to the nine questions on the form which the students filled out. (Exh. 129A.) Dr. Fisher's teaching load was 40.2 students per semester, averaged over fourteen teaching semesters. (Exh. 46A–P, 49B, 112AB–GB; R. at 1293.) A statistical summary of the student evaluations of the 21 rated courses shows that she received the following percentages of fours and fives in the categories listed:

| | |
|---|---|
| Availability to Students | 75% |
| Illumination of Materials | 73% |
| Clarity of Presentation | 76% |
| Fairness | 77% |
| Instructor Effectiveness | 79% |
| Openness to Students | 87% |
| Increased Knowledge (to Student) | 87% |
| Mastery of Subject | 88% |

(Exh. 46P, 112.) Notwithstanding the above, the Committee came to the conclusion that, "Ms. Fisher has had consistent problems with clarity and her ability to illuminate difficult materials." (Exh. 8 p. 8 ¶ 4.)

51. Of the 21 rated courses, Dr. Fisher scored within the "excellent" or "exceptionally fine" range in thirteen courses, good in six courses, and scored low in two courses; one in 1982, the other in 1983. (Exh. 49B.)

52. Over eight years of teaching, Dr. Fisher averaged 79 percent of five to four rankings on question nine, "Overall Effectiveness of Instructor," an average well above the 70 percent level identified by Dean Sullivan as "good or superior." (R. at 2147; Exh. 112.) Dr. Hemmes had 61 percent of fours and fives while Dr. Mehaffey had 68 percent. (Exh. 51D, 52A, 52E, 112.)

53. Pre-tenure, Dr. Fisher taught substantially the same number of courses as Drs. Hemmes, Mehaffey and Suter. (R. at 208.) Dr. Mehaffey had six student low-rated courses (below 60 percent fours and fives) and Dr. Hemmes had seven. Drs.

Fisher and Schlessman had two such low-rated courses. Vassar did not produce a complete record on Dr. Suter. (R. at 204, 206; Exh. 46, 49B, 51A–J, 52A–H, 112AB–GB, 125.)

54. The court finds that Dr. Fisher's teaching evaluations were better than those of the three men tenured prior to Dr. Fisher's review. These candidates had all received some poor student evaluations during their pre-tenure career at Vassar. (R. at 298–99, 373–80, 1146.) However, on each occasion that one of them was evaluated unfavorably, the Committee commented on their subsequent improvement or excused the poor assessments of their teaching skills by explaining away low ratings as student reactions to the instructor's high standards or problems inherent in the course. No such comments were made about Dr. Fisher. (R. at 1006–1019, 1823, 198, 203–07; Exh. 112AB–GB, 49B.) The Committee reported that Dr. Hemmes had fine student recommendations despite his receipt of an unfavorable student Bio-major report. (R. at 1796.) Similarly, the Committee recommended Dr. Suter highly in the face of some unfavorable remarks of the student committees. (R. at 1822–25.) Dr. Mehaffey was tenured even though he received a SAC report so unfavorable that they recommended against his tenure. (Exh. 52A.)

55. Any comparison to Dr. Norrod's teaching evaluations, which were excellent, does not give a true picture of the situation. Unlike Dr. Fisher, Dr. Norrod did not carry a full teaching load of two courses a semester. Instead, Dr. Norrod taught only one course each semester for just three semesters before tenure review, averaging no more than ten students per class. (Exh. 55D; R. at 207.) Dr. Schlessman, who also scored well, taught far fewer students than Dr. Fisher had. (Exh. 125.) Fewer students in a class allowed the professors more interaction with students. This added interaction resulting from a lighter teaching load has a positive effect on the students' evaluation of the course. (R. at 1008.) Dr. Fisher's teaching load was approximately twice that of Dr. Schlessman's and four times greater than Dr.

Norrod's teaching load. (R. at 106–07, 208–09.)

56. In discussing the student ratings of Drs. Hemmes, Mehaffey and Suter, the Biology Department Committee considered ratings of over 78 to 80 percent of fours and fives together, on Instructor Effectiveness, "exceptionally fine," "excellent," or "highly positive," and a rating of over 60 percent in these categories was considered "good." However, the Biology Department did not apply these same standards in its evaluation of Dr. Fisher for tenure. (Exh. 49B, 112AB–GB, 8, 24, 29, 51A–J, 52A–H.)

57. Dr. Fisher taught five sections of Bio 230 before her tenure review. Her ratings were high in four of the sections and low in one. (Exh. 46I, based on Exh. 46P.) The Department focused on the one low-rated section and dismissed the other four stating that, "[W]e certainly would not characterize the student evaluations for the 1978–79a and b, 1979–80b, and 1981–82 offerings (of Bio 230) as excellent, [but] we do regard them as good." (Exh. 8 p. 7 ¶ 2.)

58. However, for these four sections, Dr. Fisher scored the following percentages of fours and fives, mostly in the "excellent" range and averaged in the excellent range:

Clarity 79%, 76%, 96%, 87% (average = 84%)
Illumination 75%, 76%, 79%, 91% (average = 80%)
Instructor Effectiveness 86%, 86%, 79%, 91% (average = 85.4%)

(Exh. 32, 37, 39, 41, 46P: Summarized on Exh. 112.)

59. In these four sections, which the Committee found to be "not ... excellent," Dr. Fisher scored well over 78 percent on "Instructor Effectiveness." When the Biology Department Committee recommended Dr. Hemmes for tenure in 1979 they stated that this percentage rated his teaching ability as "exceptionally fine." (Exh. 24.) Similarly in 1980, the Biology Committee found that statistics showing an average of 83 percent of fours and fives on "Instructor Effectiveness" for Dr. Mehaffey in one course was "excellent." (Exh. 29.) It does not follow that an average of 85.4 percent for Dr. Fisher was characterized as only "good." (Exh. 8 p. 7 ¶ 2.) This, the court finds to be further evidence of the disparate treatment accorded to Dr. Fisher by Vassar College.

60. The 1985 Biology Majors Report, dated January 25, 1985, reflected students' opinions on two courses taught by Dr. Fisher: her first time instruction of Hormonal Integration (Bio 327) and General Biology (Bio 115), both in the fall of 1984. The one-page report was signed by twelve senior or junior Biology majors. (Exh. 46J.) The Biology Department's recommendation letter quoted language from this report:

The majors report for 115 states that "all students felt that she was fair, patient and caring. However, these students thought she was not well versed in this more generalized material. She lectured primarily from the text and did little to enhance or further understanding of the subject. Some commented that she was sometimes confusing in lecture." We find ourselves distressed by this characterization of Ms. Fisher's performance in our introductory courses.

(Exh. 8 p. 7 ¶ 1.)

61. In choosing to quote this language from the report, the Committee also chose to omit the first sentence of the report which stated,

Cynthia Fisher was unanimously voted one of the best professors in the Biology Department, by her advanced-level "Hormonal Integration in the Mammal" class.

(Exh. 46J.)

62. Additionally, the Committee failed to report that the second time Dr. Fisher taught the elementary biology course (115) referred to above, she received the following ratings:

88% 4–5s on Instructor Effectiveness

84% on Clarity

100% on Mastery.

(Exh. 46P p. 47.)

63. Thus, after reviewing the record, the court finds that the males tenured while Dr. Fisher was on the faculty were praised for their fine teaching while Dr. Fisher was criticized, although the facts on which the Committee's determinations were based (student evaluations, Biology Majors Reports and SAC Reports) revealed that Dr. Fisher's evaluations were superior to theirs. (Exh.

112AB–EB.) With respect to Dr. Norrod, a single woman who was recommended for promotion and tenure at the same time Dr. Fisher was denied tenure, there could be no adequate comparison as Dr. Norrod had completed only three semesters on the faculty before tenure review and had a light teaching load. (Exh. 41, 55.) Dr. Schlessman, tenured in 1987, also carried a teaching load half the size of Dr. Fisher's, making the comparison more difficult.

64. Just as these favorable reports of her teaching were ignored by the Committee, and thereafter by Vassar College in confirming the Committee's recommendation, and throughout Dr. Fisher's intra-mural appeal up to December of 1985, so were other reports from the Biology Majors which stated the following:

Mrs. Fisher is able to elucidate difficult material. (Exh. 46C, 46E.)

She enhanced the subject matter by clarifying difficult topics from the text, yet her lectures were not derived from the textbook.

(Exh. 46 O.)

The student evaluations of Ms. Fisher show a remarkable similarity in the answers to each specific question, and are consistently a highly positive critique.

"... her lectures were clear, concise, well-organized," and, "often helped to summarize and condense material;" and "[the class] ... would not have understood any of this or much cared if Ms. Fisher had not given the subject life and relevance."

(Exh. 46M.)

65. The court finds it significant that the Biology Majors Committee felt it necessary to send the Bio–Majors Report for the spring semester 1985 (Exh. 46M), quoted above, to the Appeals Committee in Dr. Fisher's case with a cover letter from the Bio–Majors Committee which stated, "we feel it [this report] is representative of her teaching not only from last semester, but throughout her years at Vassar." (Exh. 46N.)

*Additional Distortions in Vassar's Assessment of Dr. Fisher's Teaching Record*

66. The Departmental letter set up new categories and standards for tenure, either not applied to the other tenure candidates, or dishonestly assessed as to those candidates and Dr. Fisher. The categories included "independent students", meaning students either not enrolled in a Biology class or enrolled in a special class so named, and the introduction of 300 level (advanced) courses in biology. (Exh. 8.)

67. The Biology Department Committee stated that Dr. Fisher had a poor record in the supervision of students in independent research. (Exh. 8 p. 10 ¶ 2.) This conclusion, when compared to the records of the men given tenure, underlines further the bad faith of the Biology Department concerning its recommendation that Dr. Fisher not receive promotion and tenure. The Department, in its 1979 letter to the Dean recommending Dr. Hemmes for tenure, said that publication of students' research was one of the "ultimate tests" of instruction, and predicted that his students' work would be published "in the future." (Exh. 24.) None of Dr. Hemmes' students were co-authors with him on extra-mural papers nor were any of Dr. Mehaffey's students. (Exh. 64–67.) The 1984 letter recommending Dr. Suter for tenure noted that,

Mr. Suter has had great success in attracting students to work with him ... [and] has often had three students working with him during the course of a year.

(Exh. 32.) The 1985 letter recommending against tenure for Dr. Fisher stated in part that,

Another aspect of teaching of great importance to the Biology Department is the supervision of student independent research.... Ms. Fisher's record is poor in this regard.... Prior to this year she has had a total of five independent students and one volunteer who did research—a disappointing record. This year she has had five students which is commendable, though based on past performance, we are concerned that the present level of activity will not be sustained.

(Exh. 8 p. 10, ¶ 2.)

68. However, during Dr. Fisher's three tenure-track years, she had twelve independent study students, which averaged over

three students working with her in the course of a year, the standard referred to as "great success" for Dr. Suter. Including her terminal year 1985–86, she had altogether the following independent study students and assistants:

Seven students registered in Independent Study (Bio 178, 298, or 399);

nine student research assistants on College stipend or partially supported by Dr. Fisher's NSF grant; and

four adult research assistants or high school students (not Vassar students).

Two of Dr. Fisher's students were co-authors on her papers presented at national meetings.

(Exh. 50; R. at 81–2, 313, 314–18, 2397–2400.)

69. The Committee further noted her failure to introduce a 300–level (advanced) course in her area of expertise in its recommendation. (Exh. 8 p. 10 ¶ 3.) She was faulted for not developing "an advanced course of her own design which all other faculty had routinely done," and, accordingly, the Committee felt she did not "meet the criterion for high quality teaching at Vassar College." (Exh. 8 p. 11 ¶ 2.) This was false both as to Dr. Fisher and as a standard applied to other tenure candidates. At trial, Dr. Mehaffey, the Department Chair, conceded that the development of a 300–level course was not a requirement for tenure. (R. at 1474.) Nonetheless, Dean Sullivan testified that this criterion, and Dr. Fisher's alleged failure to meet it, was an important consideration discussed by the FASC that reviewed the Department's negative recommendation. (R. at 2161–62.)

70. In any event, Dr. Fisher did prepare and discuss advanced course proposals with the Department Chair which were turned down, but in 1985–86, she successfully designed and taught a 300–level course, Bio 335. (R. at 243–45, 651–53, 713–14; Exh. 96A–N.)

71. It is noteworthy that the tenure recommendations of the Department for Dr. Suter, (Exh. 32), Dr. Greenwood, (Exh. 36—not otherwise a valid comparison to Dr. Fisher's tenure eligibility since Dr. Greenwood

was hired as an Associate Professor and her review concerned her eligibility for Full Professor), and Dr. Hemmes, (Exh. 24), did not credit them with any new 300–level courses prior to tenure. This demonstrates that this criterion was not applied to these candidates at the time of their reviews. The Biology Department's letter recommending Dr. Norrod for tenure, (Exh. 39), falsely credit her with "introducing" an advanced course, Immunology (Bio 370), despite the fact reflected in Vassar College Catalogues that the same course (same number and course description) had been taught several times in prior years by other faculty, to wit, by Dr. Karen Friedman who testified that she developed the course and the course description in the catalogue. (R. at 1260–63; Exh. 94.)

*Service.*

72. In the Vassar Governance, the College's basic policy document, the only qualifications stated for attaining the tenured rank of Associate Professor are scholarship and teaching. (Exh. 2 p. 35.) Thus at Vassar, service is a tertiary criterion. Although the Committee conceded that Dr. Fisher had "served the department in a number of ways," they concluded that,

Overall then, we are not satisfied with Ms. Fisher's service to the department and feel that while her service to the college may be adequate it is in no way outstanding. We conclude that Ms. Fisher's service to the department and the college is not of sufficiently high quality for promotion.

(Exh. 8 p. 12, ¶ 2.) Despite this review, Vassar College's President Smith stated that Dr. Fisher's service to the College and to the Department had been "appreciated," and the FASC noted that Dr. Fisher's service was "good in quantity and quality." (Exh. 19, 14.) It is additionally significant that early evaluations by the Department of Dr. Fisher's service to the College and the Department were glowing. (Exh. 5G, 5N.) The only explanation for the change in attitude towards Dr. Fisher that the court can find is the discrimination manifested in its decisions concerning her culminating in its decision in 1985 not to promote her.

*Leadership.*

73. On the issue of "leadership," (defined in the Faculty Handbook as a component of service, *Faculty Handbook,* Exhibit 3, App. VII, p. 1), the Departmental Committee found "Ms. Fisher a great disappointment." (Exh. 8 p. 12 ¶ 3.) The Committee concluded that her problems stemmed from her "difficulty in establishing straightforward, open, trusting, collegial relationships with others in the department," and her lack of input "on matters of departmental concern." (*Id.*) The Committee faulted her for having a "deferential attitude." (*Id.*) Its members stated that even though her colleagues at NSF valued her abilities, she did not exhibit these abilities in the Biology Department at Vassar, and therefore "conclude[d] that she does not satisfy the criterion for academic leadership." (*Id.* ¶ 3, 4.) Again this comment was not in accordance with two previous evaluations, one in 1977 and one in 1980, in which Dr. Fisher's collegiality, personality and cooperativeness were praised. (Exh. 5G, 5N.)

74. The court further finds on the record before it that Dr. Fisher's collegiality, personal relationships, and service to the College and to its students were more than satisfactory and that the opinions given contrary to this finding by the Biology Department were pretextual. Vassar had no legitimate cause for her termination on these grounds. (Exh. 5G, 5N, 8, 14, 19.)

75. Finally, the court finds that the Biology Department senior faculty was aware of the comparative scholarship, teaching and service records of Dr. Fisher and the other faculty reviewed for tenure in light of the fact that the same three Full Professors, Drs. Donald Williams, Marcie Greenwood, and Pat Johnson, served on almost all of the tenure review committees from 1979 through 1987. (Exh. 8, 24, 32, 43, 117.)

*Curricular Balance and Tenure Structure.*

76. On the issue of "tenure profile," the Department's position was that Dr. Fisher had no unique place in the Department and, accordingly, should not get tenure. (Exh. 8 p. 13, ¶¶ 2, 3; R. at 1496–97.) The Biology Department had twelve tenure slots, six of which were already filled. There were three candidates for tenure during the academic

year of 1984–85 (Fisher, Tucker, Norrod) and one in 1986–87 (Schlessman). (R. at 2119–22.)

77. The Department's claim that Dr. Fisher offered little that was unique to the curriculum was a distortion of the situation. (R. at 48–51, 1064; Exh. 4A, 115.) In 1982, the Biology Department Senior Faculty stated, "she [Dr. Fisher] has been filling an important niche in the Department's curricular program by teaching a large number of our student majors in critical courses in their program. Their evaluations of her are quite positive." (Exh. 5U p. 6.) Moreover, Dr. Fisher's field of developmental biology was an important area of study for a modern biology department and no other member of the Department was a developmental biologist. (R. at 1147–51.) The Department did not use this excuse of curricular balance to deny tenure to Dr. Greenwood when her field of expertise overlapped with that of Dr. Pat Johnson, or when Dr. Suter's field overlapped Dr. Hemmes field. (R. at 1148–51.)

78. Nowhere in the criteria for tenure at Vassar College is it stated that "curricular uniqueness" was necessary. (See Exh. 2.) This standard was never applied to male faculty. While each member of the faculty had a curricular role and "core" courses to cover, (Dr. Fisher's track was identified upon her appointment to tenure track in 1980 (Exh. 5G)), there was considerable professional overlap in the Biology faculty's areas of expertise. (Exh. 80, 93.) Furthermore, Dean Sullivan admitted that there were discussions concerning lifting the "rigidly applied tenure ceiling" around the time of Dr. Fisher's review, suggesting that the limits on tenured faculty the Department expressed concern about were somewhat in doubt. (R. at 2174.) Accordingly, the court finds on the evidence adduced that Dr. Fisher did make a unique contribution to the Department and had professional skills which were useful to Vassar and that the Committee's conclusion on this issue was again pretextual and made in bad faith. (R. at 1151.)

79. Finally, it is significant that President Smith did not mention either service to the college or curricular balance as determinative

factors in her 1985 letter to Dr. Fisher advising her of her termination. (Exh. 19.) It is equally significant that after the denial of tenure to Dr. Fisher, Vassar advertised three times in the journal *Science* for faculty to teach the courses Dr. Fisher had taught. This indicates that the faculty identified in the Departmental letter as potential substitutes for Dr. Fisher in all of her courses were not teaching those courses. (Exh. 8 p. 13 ¶ 2, 97.) In 1986–87, those courses were in fact assigned mostly to male faculty, most of whom were recent hires. (Exh. 99, 100; R. at 1443, 1922.)

*Promotion and Tenure of Married Women at Vassar.*

80. In the 30 years prior to Dr. Fisher's tenure review, no married woman ever achieved tenure in the hard sciences (defined as Mathematics, Physics, Chemistry, Geology, Biology and Computer Science). (Exh. 82A–B, R. at 1308–12.) This information was based on the Vassar College Directory of Administration/Staff/Faculty which is published annually by Vassar College and lists each person on the faculty with that person's rank, and in parentheses lists that person's spouse, if any. Such entries for the directory are voluntarily obtained from the professor himself or herself on a form solicited annually by the College Publications Office. (R. at 2094–95.) Also consulted were faculty biography cards in the Vassar library where there are brief personal biographical files on each faculty member. (R. at 345–46, 478–79.) Between 1956 and 1985, out of 18 single women in the hard sciences department who received at least two year contracts at the Assistant Professor rank, ten were tenured and eight were terminated or left. From 1972 on, six out of nine were tenured. From 1956 to 1985, among nine women who were apparently married (by listing a male parenthetical name in the College Directory, or otherwise checked out as married from the biographical files of the College) all nine were terminated or left. (Exh. 82A–B.) Of the eight women on the Biology faculty for a period of two years in the rank of assistant professor from 1972 to 1985, three single women were tenured and the five married women left the faculty. (Exh. 82A–B.)

81. Between 1981 and 1985, two other women, Karen Friedman and Marlene Palmer, married at some time while on the Biology faculty at Vassar and first hired in 1977 as Assistant Professors, were terminated before achieving tenure. Proof was adduced that available married women were not advanced by the College for tenured positions through the several steps to tenure in Division III. Evidence adduced from Dr. Karen Friedman indicated that there was a policy of discouraging married women who were hired in the sciences as assistant professors from advancing to tenure. (R. at 418–22, 507–09, 1253–90, 1276–90, 1325–55, 1679–82; Exh. GB, 110, 111A–J.) In Dr. Friedman's case, she was asked to take a leave without pay in order to "qualify" for tenure. However, even after taking the leave, she was denied the opportunity of a contract which could have led to tenure. (R. at 1337–38.)

82. Dr. Palmer was an assistant professor in the Biology Department for six years. (R. at 509–12.) She wrote a letter to Dr. Fisher's Appeals Committee describing the prejudice at Vassar toward promoting or tenuring married women and how it negatively affected her—to the point of her securing an abortion due to her fear that having a child would affect her tenure prospects. (R. at 2342–46; Exh. 109F.) There is no record that Vassar conducted any investigation into her allegations. (R. at 2347–48.)

83. Annually since 1972 the National Academy of Science has published a report on Ph.D recipients at American universities which is broken down by professional discipline, gender, marital status and other factors. Three of these categories are: physical sciences (physics/astronomy, chemistry, geology or earth science), mathematics and biosciences. (Exh. 84A.) For the years 1972 to 1985, among women Ph.Ds in science, an average 45.4 percent were single in biosciences; 42.3 percent were single in mathematics; and 43.3 percent were single in physical sciences. (Exh. 84A–B.) Thus, the majority of these female Ph.D scientists were married. Nationally more than 50 percent of the women holding Ph.D degrees in Biology are married and were married over 20 years ago. During the four year period 1980 to 1983, 160

women applied to Vassar's Biology Department for six advertised openings. (Exh. 123.) Given that the majority of women with Ph.Ds in Biology were married, this suggests that there was a pool of married women scientists from which Vassar could have selected qualified married women scientists for their tenured scientific faculty.

84. The court finds that both the notation in Exhibit 8 concerning Dr. Fisher's time out for family (she devoted "nine years (1965–74) of her life entirely to her family and to her personal life") Exhibit 8, p. 2, and the emphasis on this fact by Dr. Pat Johnson in Exhibit 14, are reflective of bias against married women.

85. Such comments on pre-Vassar personal life and life choices were not made in any letters of evaluation of other faculty. The Biology Department senior faculty again focused on this "hiatus" aspect of Dr. Fisher's life choices regarding family priorities when the Committee made its in-person presentation to the FASC Committee on May 3, 1985, regarding its reasons for rejecting Dr. Fisher's candidacy. At that meeting the Department represented to the FASC that Dr. Fisher was "out of date—out of the field for 10 years." (R. at 2165; Exh. 14.) The reference to her being "out-of-date" implied that Dr. Fisher's scholarship was obsolete as a direct result of the period she was at home with her husband and children.

86. The hiatus in Dr. Fisher's professional career at most was a period of eight years (1966–73) and was not a total hiatus. She joined the faculty of Marist College in 1974 in the Biology Department, three years before she joined the Vassar faculty. Among Dr. Fisher's scholarly accomplishments as presented to Vassar for tenure review and discussed, *supra*, most of her grants, publications, consultantships, professional papers and other recognized accomplishments were achieved after 1977 while she was on the Vassar faculty. (Exh. 7I.)

87. The persistent fixation of the Biology Department's senior faculty on a married woman's pre-Vassar family choices reflects the acceptance of a stereotype and bias: that a married woman with an active and on-going family life cannot be a productive scientist

and, therefore, is not one despite much evidence to the contrary.

88. Expert testimony of Dr. Rita Simon, a distinguished professor at the American University in the Washington College of Law and the School of Public Affairs, established that in academia, married women are more productive than single women in many fields. Particularly in the "hard sciences", they are as productive as men, but are often not given the same rewards as either men or single women in terms of professorial rank. Based upon her studies of the question and a review of Exhibit 82 which showed that no married woman had ever achieved tenure at Vassar in the hard sciences, she stated,

> Drawing on data from a great many universities and thousands of responses from men and women in the hard sciences, and examining the performance of Cynthia Fisher, versus the other people who were coming up for tenure at the same time as she did, I concluded that Vassar was discriminating on the basis of marital status.

(R. at 966.)

89. The court finds that Vassar, despite its protest that it advances the cause of women, R. at 2276, has consistently shown prejudice toward its married female faculty in the hard sciences.

90. In support of plaintiff's claim that she was discriminated against because she is a married woman, it is significant in the spring of 1985, at or about the same time Dr. Fisher was being reviewed, Pinina Norrod, originally hired by Vassar in the Biology Department in 1983 as an assistant professor, came up for tenure. Dr. Norrod, a single woman, had taught one course each semester for three semesters prior to her tenure review whereas the standard pre-tenure teaching load was two courses per semester for at least six and one-half years. (R. at 2169; Exh. 2, 72.)

91. Although the totality of Dr. Norrod's publications and grants were substantially equal in number and quality to those of Dr. Fisher (Exh. 72, 73, 78, 108A, 108BB, 108CA), her time in rank and in the Department was six years less than Dr. Fisher's and at the time of review, she had taught

only one course per semester for three semesters with an average of only ten students per class, which was approximately one fourth of Dr. Fisher's teaching load of 40.2 students per semester. (Exh. 72; Exh. 55.) Furthermore, her research was narrow, specialized and considered inappropriate for an undergraduate curriculum. (R. at 2172.) The FASC did not approve the granting of tenure to Dr. Norrod at that time. (R. at 2173; Exh. 41.) The FASC believed that her field of research (gonorrhea) might not have been an appropriate subject for undergraduate students in laboratory courses. (R. at 2172–73.) Outside evaluators for Dr. Norrod, though supportive in their recommendations for her promotion to tenure status, noted that she had a light teaching load; a "half time instruction" record, (R. at 2170, Exh. 40C p. 2), that she had spent just two years and not the usual six to seven years in rank before tenure review, and therefore they would not grant tenure at their colleges. (Exh. 2 p. 37, 38, 39, 40A–D, 41, 55, 72, 73.)

92.　Furthermore, the court finds that the senior members of the Biology Department were determined that Dr. Fisher be denied tenure and that Dr. Norrod be promoted and granted tenure. When it became clear subsequent to the meeting with the FASC on May 3, 1985, that there might be a question about the Department's judgment on the issue of Dr. Fisher's recommendation, the Chairman and the entire Department wrote two emotionally charged letters to the Dean, the President and the FASC. (Exh. 9C–D.) They claimed that Dr. Fisher misrepresented facts. Specific "incorrect facts" to which the Department objected in its May 7 letter (Exh. 9D) were:

1) That Dr. Fisher had misrepresented to the FASC that Dr. Greenwood had served on Dr. Hemmes' tenure review Committee, arguing that M.R.C. Greenwood could *not* have participated in the tenure reviews of Hemmes and Mehaffey because her own tenure was not effective until 1980–81; and

2) That the years which Dr. Fisher had listed for tenure approvals of Drs. Hemmes (1979) Mehaffey (1980) and Suter (1984) were incorrect.

(Exh. 9C–D.) If it is true that Dr. Greenwood was not tenured until after Dr. Hemmes' and Dr. Mehaffey's reviews, then a nontenured member of the faculty participated in both of these evaluations because Dr. Greenwood's signature is on the Biology Department's recommendations of tenure for both of these candidates. In fact, all of Dr. Fisher's information as to these matters is true and was known or should have been known to the Biology Department faculty. (Exh. 24, 29, 32.)

93.　The Governance provided for a six and one half or seven year period of assistant professorship before a candidate would even be considered for a tenured appointment. (Pretrial Order, II, D(6).) The Governance provides that only under "special circumstances" may this rule be changed. (Exh. 2 p. 37.) Thus, in order for Dr. Norrod to be considered for tenure prior to this time period of service, the Biology Department had to develop the need for her tenure as a "special circumstance." The Biology Department Tenure Committee seems to have persuaded President Smith to overturn the FASC's recommendation against tenure. (R. at 2174; Exh. 9C–D.) Dr. Norrod was promoted and given tenure at the same time that Dr. Fisher was unjustly denied promotion and tenure.

*Affirmative Action for Married Women after 1972.*

94.　At trial, Dean Sullivan testified that one of his functions as Dean was to look into the requirements of "affirmative action." (R. at 2137–38.) At the time Dr. Fisher made her original complaint to Dean Sullivan concerning the absence of tenured married women in the hard sciences, Dean Sullivan stated that he took it "seriously" as did the FASC. However, he claimed that after his investigation into the complaint, he found it to be "without merit." (R. at 2139–40.)

95.　In this regard, the court inquired of Dr. Pat Johnson, a senior member of the Biology Department who served as department chair for a period of nine years, concerning Vassar's program of Affirmative Action. (R. at 1548.) Dr. Johnson did not remember when such a program was set up. Dr. Johnson could not remember the issue of married women ever being discussed. Dean

Dye, the present dean of the College, volunteered to find out the answer, but further testimony was never adduced on this subject. (R. at 1889–96.)

96. Dean Dye conceded that, "We do not have proof that there were women scientists who were married who are not in psychology, who received tenure during the years identified ... in this complaint." (R. at 2306, 2311.)

97. Based then on this unrebutted proof, the court finds that never, in at least the 30 year period, from 1956 to 1986 has Vassar advanced, through the four steps to tenure as stated in the Governance (Exh. 2 p. 37), any woman in the six "hard" sciences (Biology, Chemistry, Geology, Mathematics, Physics and Computer Science) whose marital status was at *any* time married between hiring as assistant professor and the tenure review, and that all women tenured in the hard science departments during this period were single at all times from appointment as assistant professor up to the grant of tenure, including all eight tenured from 1972 on, and including the three tenured in Biology. Moreover, the appropriate and available pool of applicants for positions in the Science Departments and particularly the Biology Department contained a large percentage of married women who would be satisfactory faculty if employed. Accordingly, this record shows an affirmative intent to deny tenure to married women in the "hard" sciences.

98. Therefore, the court finds that the denial of promotion and tenure to Dr. Fisher was the result of a pattern and practice of discrimination followed by Vassar with respect to married women in Biology.

99. Out of the five faculty who constituted Dr. Fisher's Biology Department tenure evaluation committee, two were men who were promoted in Biology while she was on the faculty. One of these men served as Department chair for Fisher's tenure review. The other three committee members, Full Professors Greenwood, Williams and Johnson, served on all the tenure review committees from 1979 to 1987 (except that neither Drs. Greenwood or Williams served on Dr. Greenwood's tenure committee in 1980). (Exh. 8, 24, 29, 32, 36, 39, 43, 117.) This fact is significant because there was a continuum of senior personnel in the rulings made by the faculty as to men and women during this period and thereby a continuum of oversight

as regards criteria and standards for tenure review.

100. The court further finds that the termination of plaintiff's employment resulted not from any inadequacy of her performance or qualifications or service, but from the pretextual and bad faith evaluation by Vassar of her qualifications relative to the four men and one single woman promoted in Biology from 1979 to 1987.

*Salary Discrimination.*

101. The court finds that Dr. Fisher was discriminated against on account of her status as a married woman as to salary from the time of her original appointment. With three years prior teaching experience, a two year postdoctoral fellowship, two doctoral and one postdoctoral publications and several grants, she was hired as a Visiting Assistant Professor of Biology in 1977 at a salary of $12,500, the minimum starting salary that year. (Exh. 7I, 102A, 113; R. at 137, 141, 389.) At the same time, Robert Suter, a male with no prior teaching experience, no post doctoral fellowship, no grants and two undergraduate publications, was hired as a Visiting Assistant Professor at a salary of $13,000. Dr. Suter specialized in animal behavior. Although his sub-specialty was different from that of Dr. Fisher, their duties and assignments in the department were comparable. Dr. Suter was put on tenure track in 1978–79. Dr. Fisher was put on tenure track in 1981–82. (Exh. 34, 68, 77, 103, 113B; R. at 381, 388–90, 2387–89.) The treatment of Dr. Fisher in comparison with Dr. Suter demonstrated salary discrimination against her own account of her gender at the time of her hiring, at the time of Dr. Suter's advancement to track and at their respective tenure decisions. There were other inequalities which support this theory as well. Dr. Hemmes received $500 over the minimum salary with only one year of teaching experience, a two-year post doctoral fellowship and one publication. He was hired at the tenure track level. (Exh. 104B; R. at 391–92.) Dr. Mehaffey received $800 over the minimum salary with no teaching experience, a two year postdoctoral fellowship, no grants and two publications. (Exh. 104B; R. at 392.) Dr. Tucker, a male who received an increment of $1000 over the minimum salary and who was hired after Dr. Fisher to perform

similar services in the Biology Department and who was denied tenure in 1985, had fewer qualifications than Dr. Fisher but was also paid more in salary than Dr. Fisher throughout the years he was on the Vassar faculty. (R. at 391–94, 995–97; Exh. 113.)

102. Dr. Schlessman who was tenured in 1987 was hired at $150 above the minimum salary with no teaching experience, one grant and no postdoctoral fellowship. (Exh. 113, 124.)

103. Additionally, a distinction was made between the initial salaries granted to married women as opposed to single women. Drs. Friedman and Norrod were both hired as microbiologists, had two years teaching experience and had post-doctoral fellowships. When Dr. Friedman, who was married at the time she came onto the Vassar faculty, was hired, her salary was $1000 annually above minimum. When Dr. Norrod, an unmarried female was hired, her salary was $6750 above minimum. (Exh. 104D; R. at 2385–86.)

104. The court finds that Dr. Fisher was discriminated against on account of her gender and from the time she was first hired by Vassar in 1977, in that: (a) her qualifications at hiring were stronger than those of the men when they were hired, but she was started at minimum salary whereas they were all paid above minimum salary. This was particularly true of a comparison with Dr. Tucker who was denied tenure at the same time as Dr. Fisher, but who was always paid $500 more per year than Dr. Fisher for substantially equal services; and (b) she was required to wait longer than any man before she was advanced to "tenure track," when her contract was renewed for 1981–83. (Exh. 102, 104A–C, 113, 7I, 64, 66, 68.) The court further finds that Vassar discriminated against married women in terms of salary discrepancies.

*Age Discrimination.*

105. Dr. Fisher presented evidence that she was discriminated against on account of her age. Dr. Fisher testified that she was born in 1932. The other persons to whom she was compared had the following birth dates: Dr. Suter was born in 1946, and Drs. Mehaffey, Hemmes and Norrod were born in 1941. Dr. Schlessman received his B.A. in 1974, indicating that he is younger than Dr.

Fisher and was probably born around 1952. (R. at 2394; Exh. 72.) Dr. Fisher also presented evidence concerning the ages of senior faculty members, Drs. Greenwood, P. Johnson and Williams. Dr. Greenwood was born in 1932 and Dr. Johnson in 1931. (R. at 2395.) Dr. Williams received his B.A. in 1955 suggesting that he was born in about 1933. (Exh. 139.)

106. The age at issue is the age at the time of tenure review. Putting the information on age together with the known tenure dates of the faculty members, the court finds that at the time of their tenure reviews the ages of the Vassar faculty members were approximately as follows:

| | |
|---|---|
| Fisher | 53 |
| Norrod | 44 |
| Mehaffey | 39 |
| Hemmes | 38 |
| Suter | 38 |
| Schlessman | 35 |
| Williams | 33 |
| Johnson | 44 |
| Greenwood | 48 |

(Dr. Greenwood was hired as an Associate Professor. This was the age at which she became a full professor.)

All faculty members, except for Dr. Greenwood, were at least nine years younger than Dr. Fisher was at the time of tenure review. The court finds that this statistical evidence gives rise to an inference of age discrimination.

107. Dr. Fisher testified that a full professor in the Vassar biology department, Dr. Sue Lumb, told her that she "was too old to ever become tenured faculty." (R. at 2392.) In addition, the Biology Department represented to the FASC in a meeting concerning Dr. Fisher's tenure candidacy that she was "out of date—out of the field for 10 years." (R. at 2165; Exh. 14.)

*Retaliation Claim.*

108. Subsequent to her leaving Vassar in May 1986, Dr. Fisher was hired at Bard College in a half-time position as adjunct faculty at a one-time salary of $5,600; a reduction from her previous salary at Vassar of $27,000. She moved her grant equipment from Vassar to Bard. (R. at 2364–65.) Dr. Fisher had difficulty in getting Dean Sullivan to sign the transfer papers for the equipment. (R. at 2365–66; Exh. 150C–E.) When the Dean finally gave permission for the transfer, he additionally gave Bard's

Dean Levine, a professional acquaintance of his, permission to keep the equipment beyond Dr. Fisher's departure from Bard. (R. at 2208–10; Exh. 136J.) When Dr. Fisher's contract was not renewed at Bard, she concluded that she had been "blacklisted" by Vassar College and that Dean Sullivan had told the Dean at Bard about her lawsuit against Vassar. (R. at 951–52.)

109. While at Bard, Dr. Fisher's performance was evaluated, although not as extensively as at Vassar, and she received very enthusiastic reviews. (Exh. 136A–G.)

110. It is clear that Dr. Fisher did not feel she could continue in her chosen field of science, and in order to minimize her damages and go on with her life she chose another field of endeavor.

111. In the fall of 1988, she was admitted to Adelphi University on Long Island where she was enrolled in a Master's program in the School of Social Work. In May 1991, she graduated with a Master's Degree in Social Work and in June, 1991, she passed her State Certification Examination as a Certified Social Worker. Since that time she has been employed as a social worker at the Poughkeepsie Continuing Treatment Center, a Division of the Dutchess County Department of Mental Hygiene where she received a starting salary of approximately $29,900 per year. (R. at 442.)

C. JURISDICTION

While timely filing a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC") functions as a statute of limitations, it is not a jurisdictional requirement for a Title VII suit. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable

tolling"); *Hallstrom v. Tillamook County*, 493 U.S. 20, 27, 110 S.Ct. 304, 309, 107 L.Ed.2d 237 (1989), *reh'g denied*, 493 U.S. 1037, 110 S.Ct. 761, 107 L.Ed.2d 777 (1990) ("In *Zipes*, we held that the timely filing of a charge of discrimination with the Equal Employment Opportunity Commission, as required under Title VII of the Civil Rights Act of 1964 … was not a jurisdictional prerequisite to suit but was subject to waiver, estoppel, and equitable tolling.") *But see Butts v. City of New York Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (district court only has jurisdiction to hear Title VII claims brought before the EEOC or reasonably related to those brought before the EEOC); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1208 (2d Cir. 1993) ("Under the ADEA an employee may not bring a discrimination claim in federal court unless she first files the charge with the EEOC").

■ Nevertheless, plaintiff has complied fully with the administrative prerequisites for Title VII and Age Discrimination in Employment Act ("ADEA") litigation by filing a timely complaint with the EEOC, claiming sex discrimination, age discrimination and discrimination in the terms and conditions of her employment, specifically in terms of her salary. (R. at 2389.)

■ Plaintiff did not claim retaliation in the EEOC proceedings. However, the Second Circuit has determined that retaliation claims are "reasonably related" to claims already raised as to permit consideration. *Malarkey*, 983 F.2d at 1208 (*citing Almendral v. New York State Office of Mental Health*, 743 F.2d 963 (2d Cir.1984)); *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir.1981). Therefore, the court concludes that plaintiff may amend her complaint to include a claim of retaliation.

■ This court has jurisdiction over the subject matter of each of plaintiff's causes of action pursuant to 28 U.S.C. § 1331,[5] 42 U.S.C. §§ 2000 *et seq.*,[6] Title VII of the Civil Rights Act of 1964, the Age Discrimination in

---

5. "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

6. Prior to *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132

(1989), civil rights plaintiffs invoking district court jurisdiction in a case such as this could rely on the substantive provisions of 42 U.S.C. § 1981. Section 1981 provides, in relevant part, as follows:

All persons within the jurisdiction of the United States shall have the same right in

Employment Act of 1967 ("ADEA"),[7] and 29 U.S.C. § 206(d)(3), the Fair Labor Standards Act of 1938.[8]

### D. TITLE VII—EMPLOYMENT DISCRIMINATION

One of the purposes of the Civil Rights Act of 1964 is to provide a federal cause of action for victims of employment discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973) ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities ..."). *See also U.S. Postal Service Bd of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (prohibitions against discrimination as part of national policy).

#### 1. In Tenure Decisions

■ At trial, defendant, through its repeated objections, argued that a university is a special employment environment in which the application of Title VII's prohibitions are

> every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

However, in *Patterson,* the Supreme Court restricted the applicability of § 1981 to the making of a contract and its enforcement in the courts and barred its application to discrimination claims after employment pursuant to a contract commenced. Congress reversed the Supreme Court's restrictive interpretation of 1981 by its 1991 amendments to the Civil Rights Act of 1964.

Nevertheless, because the events of this suit occurred prior to the 1991 amendments to the Civil Rights Act and because the 1991 Act is not retroactive, *see Landgraf v. USI Film Products, et al.,* ── U.S. ──, ──, 114 S.Ct. 1483, 1487–88, 128 L.Ed.2d 229 (1994), the 1991 amendments do not apply here.

7. Judge Cedarbaum previously ruled that plaintiff's age discrimination claim had been omitted in plaintiff's complaint in this court. (R. at 2391.) However, the age discrimination claim was part of plaintiff's complaint before the EEOC. It is within the court's discretion to permit amendments to the complaint. *Gomes v. Avco Corp.,* 964 F.2d 1330, 1335 (2d Cir.1992) ("grant of leave to amend a complaint is left to the sound discretion of the district court"). Given that plaintiff's age discrimination claim was

circumscribed. As support for its position, defendant referred to the dicta in *Lieberman v. Gant,* 630 F.2d 60 (2d Cir.1980); the Second Circuit there noted that "[a] university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom." *Id.* at 67 (*quoting Sweezy v. State of New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., joined by Harlan, J., concurring in the result), *reh'g denied,* 355 U.S. 852, 78 S.Ct. 7, 2 L.Ed.2d 61 (1957). Additionally, the court in *Zahorik v. Cornell University,* 729 F.2d 85, 92–93 (2d Cir.1984), citing *Lieberman,* discussed five reasons why "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." While the court in *Lieberman* recognized that "academic freedom does not include 'the freedom to discriminate,' "[9] the court, nevertheless, observed that Congress could not have intended that "courts would sit as 'Super–Tenure Review Committee[s].' " *Lieberman,* 630 F.2d at 67 (citation omitted).

first made to the EEOC long before trial, defendant had sufficient notice of the existence of this claim, therefore, the court concludes that plaintiff may amend her complaint to include a claim of age discrimination.

8. Defendant argued at trial that Judge Cedarbaum had previously ruled that the claim of salary disparity was not included in the complaint filed with the Human Rights Commission. (R. at 2390.) However, plaintiff's complaint before the EEOC charged defendant with "denying [her] equal terms, conditions and privileges of employment and dismissing [her] because of [her] age, sex and marital status" as a violation of New York State human rights law. (R. at 2389.) Upon reconsideration, this court concludes that disparity in salary is a denial of "equal terms, conditions and privileges of employment" under Title VII. Therefore, plaintiff's salary discrimination claim was properly before the administrative body and consequently subject to trial.

Moreover, even if plaintiff's claim of salary disparity is not part of her Title VII claim, plaintiff may amend her complaint to include a claim under the Equal Pay Act of 1963, 77 Stat. 56, § 3, enacted as § 6(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d)(3).

9. *Lieberman,* 630 F.2d at 67 (*quoting Powell v. Syracuse University,* 580 F.2d 1150, 1154 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978)).

*Lieberman*, however, concerned the comparison of files for the purpose of determining qualification. To that extent, *Lieberman* can be distinguished from the case at hand because plaintiff here, in addition to assessing qualifications, uses comparative evidence to show that the tenure process itself is a front for intentional discrimination.

Moreover, in *Gibson v. American Broadcasting Cos., Inc.*, 892 F.2d 1128 (2d Cir. 1989), the Second Circuit limited the holding in *Lieberman* to the facts of that case. While acknowledging that the university may be a special setting, the *Gibson* court noted that the tenure files at issue in *Lieberman* were incomplete so as not to permit accurate comparison. *Gibson*, 892 F.2d at 1133. Additionally, the court in *Gibson* noted that the court in *Lieberman* merely held that the district court's exclusion of comparative evidence was not an abuse of discretion.

> Thus, *Lieberman* does not stand for the proposition that comparative proof otherwise relevant is inadmissible in Title VII suits. In light of the strong remedial purposes expressed in the Civil Rights Act of 1964 and the 1972 Amendments to Title VII, where Congress aimed to give courts broad discretion, in the exercise of their equitable powers, to fashion the most complete relief possible for victims of discrimination, we could hardly hold that relevant proof was inadmissible. Hence, comparative proof is generally admissible in a Title VII discrimination suit.

*Gibson*, 892 F.2d at 1133.

Despite their reservations, the courts in both *Lieberman* and *Zahorik* acknowledged that Title VII applies equally to universities. *Zahorik*, 729 F.2d at 93 ("Tenure decisions are not exempt under Title VII ..."). In fact, Title VII was amended specifically for the purpose of including universities and other educational institutions. In *Powell v. Syracuse University*, 580 F.2d 1150 (2d Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978), the Second Circuit discussed the history of Title VII:

> As originally passed, Title VII of the Civil Rights Act exempted all educational institutions with respect to faculty employment practices. This exemption had not been part of the original Senate bill, but was proposed in a substitute bill. . . .

The Equal Employment Opportunity Act of 1972, 86 Stat. 103, sec. 3 (1972), amended Title VII to bring educational institutions within the purview of the Act. In the words of the House Report:

> There is nothing in the legislative background of Title VII, nor does any national policy suggest itself to support the exemption of these educational institution employees—primarily teachers—from Title VII coverage. Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment.

*Powell*, 580 F.2d at 1154 (citations omitted). The *Powell* court went on to observe that "far from taking an anti-interventionist position with respect to the academy, the Congress has instructed us to be particularly sensitive to evidence of academic bias." *Id.* The court in *Lieberman* distinguished *Powell* as concerning the renewal of a teaching contract rather than appointment to tenure. *Lieberman*, 630 F.2d at 64. Nevertheless, subsequently in *Zahorik*, the Second Circuit recognized the right of plaintiffs "to show that forbidden purposes lurk in a tenure decision. . . ." *Zahorik*, 729 F.2d at 93. Moreover, in *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), considering whether universities held a privilege against releasing peer review materials in tenure decisions, the Supreme Court admonished that the petitioner there could not

> seriously contend that Congress was oblivious to concerns of academic autonomy when it abandoned the exemption for educational institutions.
>
> *The effect of the elimination of this exemption was to expose tenure determinations to the same enforcement procedures applicable to other employment decisions.*

*Id.* at 190, 110 S.Ct. at 582–83 (emphasis added). In the case at hand, therefore, the tenure decisions of Vassar College are subject to the same inquiry as employment decisions challenged under Title VII by plaintiffs in other employment contexts.

2. Standards of Proof

Title VII's prohibition against discrimination provides, in pertinent part:[10]

*Employer practices:*

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Plaintiff's principal claims here are based on the disparate treatment theory of discrimination under Title VII. The Supreme Court very recently in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) clarified the requirements for proving a claim of disparate treatment under Title VII that were established in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817 (1973) and refined in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[11]

In *McDonnell Douglas,* the Supreme Court established a three-part "order and allocation of proof in a private, non-class action challenging employment discrimination." *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. at 1823: First, the plaintiff must establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. If the plaintiff establishes a prima facie case, then the burden of production shifts to the employer to show "some legitimate, nondiscriminatory reason" for the employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Finally, if the defendant meets its burden, plaintiff must "be afforded a fair opportunity to show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

In *Burdine,* the Supreme Court reviewed the three-step process established in *McDonnell Douglas* and elaborated upon the second step. The Court held that the defendant's burden of providing a nondiscriminatory reason for its employment decision is not a burden of persuasion but a burden of production. In other words, the defendant need not prove its legitimate, nondiscriminatory reason, merely articulate it. *Burdine,* 450 U.S. at 256–60, 101 S.Ct. at 1095–97.

Most recently, in *Hicks,* the Court settled a divergence among the circuits regarding the meaning of the third prong of the *McDonnell Douglas* test.[12] Because the burden of persuasion is borne at all times by the plaintiff, the Court concluded that at the third prong of the test, plaintiff must not only prove that defendant's legitimate, nondiscriminatory reason is a pretext, plaintiff must prove that defendant's reason is "a pretext *for discrimination.*" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752, 125 L.Ed.2d at 421–22 (emphasis in original). The Court held that plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Id.* at ——, 113 S.Ct. at 2752, 125 L.Ed.2d at 422. In other words, even if plaintiff proves that the reason proffered by defendant is a lie, plaintiff may not succeed unless she proves the ultimate question of intentional discrimination. *Id.* at ——, 113 S.Ct. at 2751–52, 125 L.Ed.2d at 421.

In proving discrimination, plaintiff need not rely on direct evidence. *Aikens,* 460 U.S. at 717, 103 S.Ct. at 1483 ("District Court erroneously thought that respondent was required to submit direct evidence of discriminatory intent...."). Either direct evidence or circumstantial evidence will serve to prove discriminatory intent. *Id.* at 714 n. 3, 103 S.Ct. at 1481 n. 3 ("As in any lawsuit, the plaintiff may prove [her] case by direct or circumstantial evidence").

Statistics may be part of plaintiff's case in proving discrimination. In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a case involving systemic disparate treatment, the Supreme Court noted that "our cases make it unmistakably clear that '[s]tatistical analyses have served

---

**10.** 42 U.S.C. § 2000e–2

**11.** *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2746–47, 125 L.Ed.2d at 415.

**12.** *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2749–50, 125 L.Ed.2d at 419.

and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue." *Id.* at 339, 97 S.Ct. at 1856 (*quoting Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (citations omitted). *See McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825 (statistical evidence may be used in proving pretext in disparate treatment case). *See also Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) (approving use of statistical evidence in disparate impact context); *Bryant v. Intern'l Schools Services Inc.,* 675 F.2d 562, 573 (3d Cir.1982) (in disparate impact context, "statistical proof serves 'an important role' in discrimination cases and may often successfully establish plaintiff's *prima facie* case") (*quoting Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856) (citations omitted)).

### E. BECAUSE OF SEX

Plaintiff claims that she was discriminated against "because of . . . sex." She claims that even though she was qualified for the position, she was not promoted to the tenured position of Associate Professor while less qualified males were so promoted. Plaintiff alleges that this failure to promote her to a tenured position occurred because of her sex.

Discrimination "because of . . . sex," as used in Title VII, does not refer only to discrimination due to sex alone.

> The scope of Section 703(a)(1) is not confined to explicit discrimination based 'solely' on sex. In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.1971), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). Plaintiff presents evidence to support two separate theories of sex discrimination. Plaintiff argues that she was discriminated against because she is a woman and because she is a married woman.

 As noted above, plaintiff brings her claims under a theory of disparate treatment. The "burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094.

To establish a prima facie case of sex discrimination, plaintiff must show (i) that she is a member of a protected class; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2746-48, 125 L.Ed.2d at 415-16.

In establishing these criteria, however, the Court in *McDonnell Douglas* noted that because the facts of individual Title VII cases will vary, the specification of proof will not necessarily be applicable in all cases. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In *Burdine,* citing its qualification in *McDonnell Douglas,* the Court defined the proof required for a prima facie case in the context of a sex discrimination claim as requiring that plaintiff "prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." 450 U.S. at 253, 101 S.Ct. at 1094. *See also Schwabenbauer v. Board of Ed. of City School Dist. of City of Olean,* 667 F.2d 305, 309 (2d Cir.1981) (in order to establish a prima facie case, "a female plaintiff may show that she was treated less favorably than men in circumstances from which a gender-based motive could be inferred").

#### 1. Discrimination Against Fisher as a Woman

 Plaintiff claims first that she was not promoted to a tenure position because she is a woman and that less qualified men were subsequently promoted. Plaintiff, however, has failed to establish a prima facie case for her claim alleging discrimination based purely on sex. Plaintiff has established that she is a woman and that she was qualified for a tenured position in the Biology Department. She argues that men—Drs. Richard Hemmes, Leathem Mehaffey, Robert Suter and Mark Schlessman—who were less qualified or who had qualifications equal to hers were tenured either shortly before or shortly after she was denied tenure. However an-

other woman, Dr. Pinina Norrod, who was considered for tenure at the same time as plaintiff, was awarded tenure. Moreover a man, Dr. Edward Tucker, who was considered for tenure at the same time as Dr. Fisher and Dr. Norrod, was denied tenure. These facts, along with the fact that several women sat on the tenure committee and the fact that several women had been tenured previously in the department, result in plaintiff's failure to establish a prima facie case under plaintiff's first theory of simple sex discrimination.

2. Discrimination Against Fisher as a Married Woman

In addition to her claim of pure sex discrimination, plaintiff claims that she was denied tenure because she is a married woman. *See Sprogis,* 444 F.2d at 1198 (Title VII not limited to claims based solely on sex).

In *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam), the Supreme Court determined that discrimination based on marital status qualifies as discrimination "because of ... sex" under Title VII. *Marietta* involved a plaintiff challenging a corporation policy not to accept applications from women with pre-school-aged children while accepting applications from men with pre-school-aged children. The Court noted that the District Court had found that 75–80% of those hired for the position sought by plaintiff were women and, therefore, that no question of bias against women as such was presented. Nevertheless, the Court held that "permitting one hiring policy for women and another for men—each having pre-school-age children" was a violation of Title VII. *Marietta,* 400 U.S. at 544, 91 S.Ct. at 498.

▪ By this decision, the Court established the doctrine of "sex-plus" in Title VII cases. In other words, in certain circumstances, if sex plus some other characteristic results in discrimination against one sex,

then Title VII is violated. In his concurrence, Justice Marshall explained,

[b]y adding the prohibition against job discrimination based on sex to the 1964 Civil Rights Act Congress intended to prevent employers from refusing 'to hire an individual based on stereotyped characterizations of the sexes.' Equal Employment Opportunity Commission, Guidelines on Discrimination Because of Sex, 29 CFR § 1604.1(a)(1)(ii). *See Bowe v. Colgate–Palmolive Co.,* 416 F.2d 711 (7th Cir.1969); *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228 (5th Cir.1969). Even characterizations of the proper domestic roles of the sexes were not to serve as predicates for restricting employment opportunity.

*Marietta,* 400 U.S. at 545, 91 S.Ct. at 498 (Marshall, J., concurring) (citations omitted). When stereotypes regarding some characteristic results in disparate treatment, the synthesis of that characteristic and sex is discrimination "because of ... sex" under Title VII.

▪ The "sex-plus" doctrine applies to marital status. *See Bryant,* 675 F.2d at 573 n. 18 (citing *Phillips v. Martin Marietta Corp.,* 411 F.2d 1 (5th Cir.1969), *petition for reh'g denied,* 416 F.2d 1257, *vacated and remanded,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971)) ("In what has come to be known as a "sex-plus" problem, a claim of sex discrimination may be premised upon marital status"); *Sprogis,* 444 F.2d 1194 (citing *Marietta* ) ("no marriage" rule of United Airlines violated Title VII); *Lansdale v. United Airlines, Inc.,* 437 F.2d 454 (5th Cir.1971) (citing *Marietta* ) (vacating prior determination that discrimination on the basis of marital status was not a violation of Title VII). If policy or stereotypes about married women result in the disparate treatment of married women, then Title VII is violated.[13]

▪ At trial plaintiff presented evidence in support of her claim that she was discriminated against because of her marital status: 1) evidence distinguishing between departments in the "hard"[14] sciences (including the

---

13. *See also* EEOC Decision No. 72–1334, (available on WESTLAW FLB–EEOC database.) 1972 EEOC Lexis 43 (March 15, 1972) (no marriage policy is violation of Title VII); EEOC Decisions No. 70–38, (available on WESTLAW FLB–EEOC database). 1969 EEOC Lexis 15, (July 14, 1969) (same).

14. The "hard sciences" have been defined as the Departments in Division III of the Vassar College departments of instruction (Mathematics, Physics/Astronomy, Chemistry, Geology, Biology, Psychology) excluding Psychology. (Pretrial Order, II B(b) p. 4; R. at 52.) Defendant disputes the claim that Psychology is not included in the hard sciences. (R. at 2217–18, 2318.)

Mathematics, Physics, Chemistry, Geology, Biology and Computer Science departments) and the departments in the rest of the College; 2) evidence that traditionally the "hard" sciences faculties have been composed of men (married and single) and women (single only); 3) evidence that although married women constituted 52 percent of the women in science nationally, no married woman had ever received tenure in the "hard" sciences at Vassar. Plaintiff claims that it was her decision to be a wife, mother and a scientist before seeking tenure at Vassar that resulted in the denial of tenure application.

Part of plaintiff's claim of sex discrimination due to her marital status involves the fact that plaintiff left formal academia for approximately eight years in order to raise a family.[15] In 1965, when plaintiff left academia, marriage and family went hand in hand for women, especially for women of plaintiff's race and class. Prior to the 1970's Women's Movement and social advances that have permitted women more freedom in shaping their private and professional lives, women who were of plaintiff's race and class rarely had children out of wedlock. Likewise, women of plaintiff's race and class who were married almost always had children. In other words, raising a family was an assumed aspect of marriage.

Subsequent to her parental leave, plaintiff returned to academia and spent nine years in academia before coming up for tenure. She claims that despite her qualifications and her progress in becoming current in her field, her absence from academia was held against her as an insurmountable barrier.

Plaintiff established a prima facie case of discrimination because of sex against her as a married woman. Plaintiff established that she is a member of a protected class—married women. She has demonstrated that she was qualified for the tenure position for which she applied.

Finally, plaintiff has demonstrated that she was rejected under circumstances giving rise to an inference of unlawful discrimination.

**15.** Plaintiff's argument regarding her parental leave is part of her disparate treatment claim. However, plaintiff might have sought to prove this part of her case under the disparate impact theory as well.

The theory of disparate impact under Title VII was established in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Court held that absent a showing of discriminatory intent, discrimination exists where hiring requirements are neutral on their face—requiring a high school diploma or passing a standardized test—but 1) are not significantly related to successful job performance, 2) have a disproportionate effect on a class protected under Title VII, and 3) the jobs in question had previously been filled by whites. The Court concluded that Congress' purpose in enacting Title VII was "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853.

In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court held that height and weight requirements for employment at an Alabama correctional facility had a impermissible disparate impact on women. Similar to a disparate treatment claim under Title VII, the Court in *Dothard* restated the shifting burdens of proof in a disparate impact case, as established in *Griggs* and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

In *Dothard*, the Court held that to establish a prima facie case of disparate impact under Title VII, "a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern." *Dothard*, 433 U.S. at 329, 97 S.Ct. at 2726–27. Subsequently, however, in *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the Court heightened the standard for a prima facie case. While the Court noted that "statistical proof can alone make out a prima facie case," *Wards Cove*, 490 U.S. at 650, 109 S.Ct. at 2121 (citations omitted), the Court specified the statistical comparison that must be made to establish a prima facie case. Reversing the decision of the Ninth Circuit, the Court held that

The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." It is such a comparison—between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs—that generally forms the proper basis for the initial inquiry in a disparate-impact case.

*Wards Cove*, 490 U.S. at 650–51, 109 S.Ct. at 2121 (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)).

Plaintiff, here, would have had to present evidence of the number of women with children in the Department versus the number of qualified women with children in the teaching market. She also would have needed to produce evidence of the number of women who took parental leave in the Department versus the number of qualified women who have taken parental leave.

Additionally, in disparate impact cases, the Court has held that a "specific causation requirement" must be met in order to establish a prima

Plaintiff presents evidence that prior to, contemporaneous with, and subsequent to her denial of tenure, the Biology Department at Vassar College tenured only faculty members who were not married women (single women, single men and married men) and who had qualifications less than or equal to hers.

Defendant, however, rebutted plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for the tenure decision. Defendant presented evidence that Dr. Fisher's denial of tenure was based on an unfavorable evaluation of plaintiff's qualifications based on Vassar College's standards for tenure.

Moreover, defendant argued that the professors who were granted tenure at the approximate time that plaintiff was denied tenure were more qualified and filled specific needs of the department.

In that Vassar College has satisfied its rebuttal burden by presenting a legitimate, non-discriminatory reason for its actions regarding Dr. Fisher, Dr. Fisher has the right to prove that defendant's reason is a pretext for discrimination.

Plaintiff has presented evidence that defendant's references to standards and Dr. Fisher's lack of qualifications according to the categories of evaluation are pretextual. Defendant claims to have evaluated Dr. Fisher's performance in three main categories—scholarship, teaching ability and service to the College. Nevertheless, several times during the trial, witnesses for defendant admitted that the meaning and specifications of these categories are not written down so as to permit plaintiff to know what was expected of her and to give credibility to the standards as such. For example, the Department's recommendation to deny Dr. Fisher's application for tenure criticized Dr. Fisher's alleged lack of community service because she was not sufficiently vocal at departmental meetings. This requirement, however, is not specified in any listing of tenure requirements. In *Barbano v. Madison County*, 922 F.2d 139, 145 (2d Cir.1990), the Second Circuit considered as evidence of discrimination the fact that the Madison County Veterans Affairs Committee had considered a male applicant's military record and involvement in selecting him for a position over a female applicant even though neither military record nor involvement was listed as job requirement. In light of the district court findings as to the female applicants qualifications, the court in *Barbano* concluded that there was sufficient evidence of discrimination for liability. In this case, given Dr. Fisher's demonstrated qualifications,[16] the Department's use of unwritten standards as a basis for denying Dr. Fisher's application for tenure is evidence of the pretextual nature of defendant's non-discriminatory reason.

Another indication of the pretextual nature of defendant's claim that plaintiff's denial

facie disparate impact case. Quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988), the Court stated the law regarding causation in a disparate impact case as follows:

"... the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged...."

*Wards Cove*, 490 U.S. at 656, 109 S.Ct. at 2124. Referring to the decision in *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Court held that

a Title VII plaintiff does not make out a case of disparate impact simply by showing that, "at the bottom line," there is racial *imbalance* in the work force. As a general matter a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.

*Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2124–25 (emphasis in original).

Had plaintiff presented the required evidence to show a statistical disparity necessary for the first part of a disparate impact case, the second aspect of the prima facie case would have been satisfied in that it appears that plaintiff's leave of absence was a specific reason that she was denied tenure. (Exh. 8, 14; R. at 1906, 2165.)

If plaintiff had established a prima facie disparate impact case, then defendant would have had to demonstrate a business justification for the disparity consisting of two components: 1) defendant's business justification and 2) the availability of alternative practices.

If defendant established the existence of a business necessity, plaintiff would have to show that other tests or selection devices, without a similarly undesirable ... effect, would also serve the employer's legitimate [hiring] interest[s] *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126.

**16.** Among other things, she served as a premajor and major advisor, served on committees for handicapped students and safety, and was the audiovisual coordinator for the Biology Department. (Exh. 7 V.) Dr. Fisher also spent time

was the outcome of the ordinary tenure process is the arbitrary nature of defendant's "standards" for review. Even if defendant had listed the specifics of each of the tenure categories, defendant's witnesses admitted at trial that there was no scale by which to weigh the various categories. As a result, in any given case a candidate's teaching performance could be considered as a very important qualification in some cases and only a moderately important qualification in other cases. More to the point, the "standards" could be used as a mask to disguise discriminatory intent by allowing evaluators to arbitrarily place importance on the categories in which a less favored candidate is weak and place no importance on the categories in which a less favored candidate is strong.

Not only has plaintiff proven by a preponderance of the credible evidence that defendant's legitimate, non-discriminatory reason—the use of the tenure standards and process—is pretextual, plaintiff has also proven that defendant's reason is a pretext for discrimination. *See Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407.

Plaintiff points to the legerdemain used by the Department to discredit her teaching performance as evidence of defendant's discriminatory intent. A tenure candidate's teaching performance is based largely on student evaluations.[17] Two types of student evaluations are considered: 1) the report of the majors and 2) course evaluations.[18] In the course evaluations, students are asked to rank the professor in nine different categories[19] on a scale of one to five; one being the lowest and five being the highest.[20] In eval-

uating the performance of male tenure candidates and non-married female tenure candidates, the Department considered the percentage of students ranking the "Overall Effectiveness of the Instructor" in the top two positions—as a four or a five. In evaluating Dr. Fisher's teaching performance, the Department considered only the percentage of students ranking her overall effectiveness in the top position—as a five. As a result, Dr. Fisher's percentages obviously appeared smaller, and her teaching performance appeared inferior when compared to others. A more scrupulous investigation, however, reveals that the requirements for teaching performance were applied unfairly and that the Departments tenure "standards" served as a pretext for discrimination.

Plaintiff also presented statistical evidence of defendant's discriminatory nature. In the 30 years prior to her review no woman who was married had achieved tenure in the hard sciences. For the period from 1972–1985, more than 50 percent of the women holding Ph.D. in the hard sciences were married indicating that the pool of potential married women was available to Vassar College. Moreover, from 1980 to 1983, 160 women applied to the Biology Department. Given the statistics, it is most likely that the majority of these women who had applied to the Vassar Biology Department were married.

In addition to statistical evidence of discrimination against married women, plaintiff presented anecdotal evidence. A Dr. Karen Friedman testified that there was the Department's policy to discourage married women from advancing to tenure. Dr.

helping a suicidal student receive counseling and supported her by visiting her in the hospital. (R. at 304–05.)

17. The Biology Department admitted that unfavorable student evaluations can be attributed to student reactions to factors such as problems inherent in a course or the instructor's stringent standards. In addition, an expert witness noted that the size of a class has an impact on the students' evaluation of the professor; the smaller the class, the more positive the impact. For example, Dr. Norrod, who had excellent evaluations, taught an average of ten students per class while Dr. Fisher averaged closer to forty (40). It is possible that Dr. Norrod's evaluations would not have been as positive had she carried a larger class load. These factors strongly suggest that the accuracy of student evaluations is questionable. *See Lieberman v. Gant*, 630 F.2d 60, 66

n. 10 (2d Cir.1980) (student evaluations are by no means a perfect index of teaching ability).

18. Dr. Fisher's teaching performance was based almost completely on these evaluations because her classroom performance was never directly observed by any member of the tenure committee.

19. The categories are: 1) Increased Knowledge and Understanding of the Subject Matter; 2) Clarity of Presentation; 3) Mastery of the Subject Matter; 4) Ability to Illuminate Difficult Material; 5) Openness to Student Questions or Disagreement; 6) Availability for Individual Consultation; 7) Fairness; 8) Overall Effectiveness of the Course; and 9) Overall Effectiveness of the Instructor.

20. There was a change in the evaluation forms. Both the old and the new forms had rankings

Friedman personally experienced this policy when she was asked to take an unpaid leave of absence in order to qualify for tenure which she never received.[21] Another woman, Dr. Palmer, felt the prejudice against married women was so strong that she had an abortion in an attempt to protect her tenure prospects. She wrote a letter to Dr. Fisher's Appeals Committee to notify them of this prejudice but no investigations were made into her allegations.

Considering plaintiff's evidence as a whole, she has succeeded in proving that defendant's proffered reasons are pretextual and that defendant intentionally discriminated against her because of sex in violation of Title VII.

## F. MIXED MOTIVE

■ In addition to the evidence proving discrimination through inference discussed above, plaintiff presented direct evidence of discrimination which calls for a consideration of the case according to the mixed motive theory of disparate treatment.

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), plaintiff was an accountant who was rejected for partnership despite clear indications that she was qualified. Hopkins presented direct evidence of sex discrimination in the form of statements by evaluators that she was "macho," "overcompensated for being a woman," needed "a course at charm school," and should "walk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Hopkins,* 490 U.S. at 235, 109 S.Ct. at 1782. Despite this clearly discriminatory motive, the Court also found that Price Waterhouse had legitimate

complaints against Hopkins in that she lacked certain interpersonal skills and was unnecessarily abrasive in dealing with staff.[22] *Hopkins,* 490 U.S. at 236, 109 S.Ct. at 1783. The decision in *Hopkins,* in other words, involved both legitimate and illegitimate considerations. The Court concluded that "Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." *Hopkins,* 490 U.S. at 241, 109 S.Ct. at 1785. The Court noted that the purpose of Title VII was to preserve the employer's right to make independent business decisions while proscribing certain discriminatory considerations. *Hopkins,* 490 U.S. at 241–244, 109 S.Ct. at 1785–87. Therefore, the Court held, "once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." [23] *Hopkins,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88.

In the case at hand, plaintiff has presented evidence of a virtual smoking gun. On Dr. Fisher's faculty record card the President of the College noted that the Department's negative recommendation was "overkill" on their part. (Exh. 15.)

This notation is direct evidence that the President believed that the Department's recommendation to deny Dr. Fisher's application for tenure was not made without bias. In *Barbano,* the Second Circuit determined that an organization may be found liable for relying upon a committee recommendation that has been tainted by discrimination. *Barbano,* 922 F.2d at 143–45. It is clear that in this case, Vassar College did rely upon the negative recommendation of the Department

---

from one (1) to five (5). However, the standard for receiving a certain ranking are different. For example, a rank of a four to a five on the old form is considered high, while a five on the new form is considered outstanding. Defendant argues that the difference in these terms would generate different responses because students would be more likely to give a five if it denoted a ranking of "high" than a five if it denoted a rank of "outstanding." The student might instead give a four which is considered "superior." (R. at 200–01.)

**21.** After her leave, Dr. Friedman's contract was not renewed, denying her the opportunity to achieve tenure.

**22.** But see Note, "In Praise of Macho Women: *Price Waterhouse v. Hopkins,*" 46 U.MIAMI L.R. 835 (1992), arguing that even the complaints regarding Hopkins' interpersonal skills that the court accepted as legitimate were actually stereotypical characterizations violative of Title VII.

**23.** The Civil Rights Act of 1991 modified the Supreme Court's holding in *Hopkins* concerning when a plaintiff is entitled to relief in a mixed motive case. As amended by the Act, Title VII provides that a plaintiff establishes an unlawful employment practice "when [she] demonstrates

in denying Dr. Fisher's application for tenure because the College-wide faculty committee gave a positive recommendation for tenure, as did Dr. Fisher's outside evaluators. Therefore, the evidence of Vassar College's knowing reliance on the Department's biased recommendation provides direct evidence of Vassar College's intentional discrimination.

Additionally, Dr. Mehaffey admitted at trial that the fact that the time plaintiff had taken off in order to raise a family was a principle factor in the Department's recommendation to deny her tenure. (R. at 1906.) He felt that this represented a huge gap in her knowledge which she was unable to rectify. (*Id.*) This statement was in spite of the fact that she was actively publishing and researching after her hiatus. This is also direct evidence that the Biology Department, perhaps still deeply rooted in the tradition of the hard sciences, was unable to overcome the stereotypical view of women as either scientist or wife—but not both.

Under the *Hopkins* mixed motive analysis, since plaintiff has proven that sex played a motivating part in the decision not to grant her tenure, defendant must prove that it would have denied her tenure even if plaintiff were not married and had not taken time to raise a family.

While defendant has argued that the tenure decision in plaintiff's case was simply the result of the tenure process, it has been unable to prove that its evaluation of plaintiff's qualifications, absent discriminatory considerations, would have been the same. This is especially true in light of the fact that the faculty committee that was not based in the hard sciences gave plaintiff a positive recommendation as did plaintiff's evaluators from outside of the College.

Therefore, since plaintiff has presented direct evidence of discrimination and since defendant has failed to prove that it would have made the same decision absent the consideration of illegitimate factors, plaintiff has successfully proven her case of discrimination by defendant because of sex in violation of Title VII.

that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). However, under the 1991 Act, if an employer is able to establish that it would have taken the same action absent any illegitimate motive, the court is limited in the type of relief it may order. *See* 42 U.S.C. § 2000e–5(g)(2)(B).

## G. AGE DISCRIMINATION

The ADEA prohibits employers from discriminating against employees who are at least 40 but less than 70 years old on the basis of their age. 29 U.S.C. §§ 621, 623, 631. It is well-established that claims under the ADEA undergo the same burden-shifting analysis developed for Title VII claims in *McDonnell Douglas* and *Burdine*. *Robinson v. Overseas Military Sales Corp. et. al.*, 21 F.3d 502, 507 (2d Cir.1994) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985)); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Due to the inherent difficulties in proving discrimination under the ADEA, courts have allowed plaintiff's use of statistical evidence to establish a prima facie case. *See Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856.

In order to establish a prima facie case of discrimination in violation of the ADEA, a plaintiff must show (1) that she was a member of the protected group, (2) that she was qualified for the job, and (3) that she was discharged "under circumstances giving rise to an inference of age discrimination." *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 359 (2nd Cir.1993) (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir.1990); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir.1983)).

Dr. Fisher has met her burden of establishing a prima facie case of age discrimination. She was 53 years old at the time of her tenure denial, she was well qualified for the position and the statistical evidence on faculty members ages at tenure review showed that all other tenured faculty who were equally or less qualified than Dr. Fisher were at least nine years younger than Dr. Fisher when they were tenured.[24]

That some of the tenured faculty members were over 40 when they were promoted does not undercut this finding. Other courts have found an inference of age discrimination where there was a similar or lesser age

Nevertheless, since the 1991 Act is not retroactive, the *Hopkins* standard applies in the instant case.

**24.** This statistic excludes Dr. Greenwood who was five years younger than Dr. Fisher when she joined the Vassar faculty but was hired at the tenured level.

differential than in the instant case. *See Franz v. Raymond Eisenhardt & Sons, Inc.,* 732 F.Supp. 521, 526 (D.N.J.1990) (fact that discharged employee was replaced by an employee only five years younger than discharged employee did not show, as a matter of law, that discharged employee could not establish a prima facie case of age discrimination); *Obitko v. Ohio Barge Line, Inc.,* 628 F.Supp. 62 (W.D.Pa.1986) (plaintiff established prima facie case of age discrimination even though he was replaced by an employee who was older; employee was within the protected group, was qualified, and was involuntarily discharged); *but see Bost v. Holly Farms Foods Inc.,* 823 F.Supp. 384, 386 (W.D.N.C.1993) (terminated employee replaced by 42–year old and 46–year old did not establish prima facie case of age discrimination because replacements were not outside the protected group).

In its defense, defendant asserts that plaintiff was denied tenure because she was not qualified for the position. However the court finds that defendant's articulated reason for denying tenure to be pretextual as set forth *supra.* Accordingly, plaintiff has proven that defendant has discriminated against her in violation of the ADEA.[25]

## H. EQUAL PAY ACT CLAIM

 Section 206(d)(1) of the Fair Labor Standards Act provides in part that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). "For purposes of the Act, 'equal' means 'substantially equal'; male and female jobs may be compared even if they are not identical." *Horner v. Mary Institute,* 613 F.2d 706, 713 (8th Cir.1980) (citing *Peltier v. City of Fargo,* 533 F.2d 374, 377 (8th Cir.1976)); *see* 29 C.F.R. § 1620.14 (1986). In order to sustain a claim under the Equal Pay Act, plaintiff must show that the jobs at issue require "equal effort, skill and responsibility, . . . and are performed under similar working conditions." *McKee v. McDonnell Douglas Technical Services Co.,* 700 F.2d 260, 263 (5th Cir.1983), *amended, reh'g denied,* 705 F.2d 776 (5th Cir.1983); *EEOC v. Altmeyer's Home Stores, Inc.,* 672 F.Supp. 201, 214 (W.D.Pa.1987); 29 C.F.R. § 1625.15–.18 (1986). Plaintiff has the burden of proving by a preponderance of the evidence that the jobs were essentially equal. *Graham v. Texasgulf, Inc.,* 662 F.Supp. 1451, 1464 (D.Conn.1987) *aff'd without op.,* 842 F.2d 1287 (2d Cir.1988). If plaintiff is able to show a differential in wages on the basis of sex, then defendant must show that this dif-

**25.** Plaintiff also presented direct evidence on this claim. In cases where plaintiff has presented direct evidence of discrimination, it is unnecessary to apply the *McDonnell Douglas* analysis. *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989) (citing *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1014 (2d Cir. 1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981)). Rather, once plaintiff has established that an illegitimate factor played a substantial role in the employment decision, defendant has the burden of proving by a preponderance of the evidence that it would have reached the same decision without consideration of the illegitimate factor. *Hopkins,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88.

Dr. Fisher testified that a full professor in the Vassar Biology Department told her that she "was too old to ever become tenured faculty."

(R. at 2392.) Moreover, the Biology Department represented to the FASC in a meeting concerning Dr. Fisher's tenure candidacy that she was "out of date—out of the field for 10 years," (R. at 2165; Exh. 14.) However, these statements do not establish, by themselves, direct evidence of an illegitimate factor. The court interprets the Department's statement to the FASC not as direct evidence that age played a part in its decision but rather as an attempt to convey that she was not up to speed in educational requirements and/or research techniques even though this is contrary to the evidence. Furthermore, Dr. Lumb's statement that Dr. Fisher was too old to be considered for tenure is not attributable to the Tenure Committee's decision making process since she was not a member. This statement could be attributed to the sentiment of the Department but on its own does not meet plaintiff's burden.

ferential falls within one of the four exceptions to 206(d)(1). *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Winkes v. Brown University,* 747 F.2d 792, 793 (1st Cir.1984).

Dr. Fisher presented evidence which demonstrated that married women received less in salary than men or single women in substantially similar positions. Dr. Fisher's data compared the starting salaries of men, single women and married women relative to the minimum possible starting salary. Men with lesser qualifications than plaintiff received salary increments above the minimum wage while Dr. Fisher started at the minimum. A single female hired to teach the same course as a married female received approximately $5,000 more in salary (above the minimum wage) than the married female. She also demonstrated that the job of an assistant professor in the Biology Department is essentially the same with regard to skills required, effort involved and responsibility afforded to the instructor regardless of the specific courses being taught by that instructor. Accordingly, the court finds that plaintiff, Dr. Fisher, has established a case under the Equal Pay Act.

Vassar has failed to present any evidence that would show that the pay disparity was based on factors other than sex. Therefore, the court finds that defendant has violated the Equal Pay Act.

## I. RETALIATION

The Second Circuit has determined that retaliation claims not raised in the EEOC proceedings are "reasonably related" to claims already raised as to permit their consideration, *Malarkey,* 983 F.2d at 1208, and, therefore, this court allowed plaintiff to amend her complaint to include a claim for retaliation despite the fact that this claim had not been raised during the EEOC proceedings. However, after hearing all the evidence concerning this issue, the court finds that Dr. Fisher's allegation of retaliation is more aptly described as a "blacklisting" or "negative reference" claim. After her termination of employment at Vassar, Dr. Fisher took a position as a Visiting Assistant Professor at Bard College. Dr. Fisher alleges that the Dean of Vassar informed Bard's Dean of this discrimination action which caused Bard not to renew her employment contract. (Compl. ¶ 9.) In addition, Dr. Fisher testified that she felt she had been "blacklisted" by Vassar College. (R. at 951–52.)

Title VII does not provide protection concerning blacklisting claims not made part of an EEOC charge. *McPartland v. American Broadcasting Companies, Inc.,* 623 F.Supp. 1334, 1343 (S.D.N.Y.1985) (citing *Ferguson v. Mobil Oil Corp.,* 443 F.Supp. 1334 (S.D.N.Y. 1978), *aff'd,* 607 F.2d 995 (2d Cir.1979)). The court in *Ferguson* held that post-employment charges of blacklisting are outside the scope of Title VII proscriptions for two reasons; the alleged activity is not discrimination and because the activity took place after the employee's discharge, it is not an "employment practice" as required under 42 U.S.C. § 2000e–3. *Ferguson,* 443 F.Supp. at 1339. *But see Bilka v. Pepe's Inc.,* 601 F.Supp. 1254, 1259 n. 9 (N.D.Ill.1985) (employer violates Title VII if post-employment negative references are made in retaliation for plaintiff's assertion of her Title VII rights).

Plaintiff's claim of post-employment blacklisting are beyond the scope of Title VII. Accordingly, plaintiff here has not stated a claim which violates Title VII.

## J. REMEDIES

The remedies available under Title VII are provided for in 42 U.S.C. § 2000e–5(g):

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate....

The purpose of Title VII remedies is to make victims of discrimination whole. Toward this end, courts generally have wide-ranging power to fashion appropriate remedies. In *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991), a case involving the dis-

parate impact theory of discrimination, the Second Circuit held that

> [o]nce a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it believes appropriate. The bounds of the court's discretion are set in part by Title VII's goals of preventing discrimination and achieving equal employment opportunity.

*Bridgeport Guardians,* 933 F.2d at 1149 (*citing Teamsters,* 431 U.S. at 364, 97 S.Ct. at 1869; *Albermarle,* 422 U.S. at 417, 95 S.Ct. at 2371; *Griggs,* 401 U.S. at 429–30, 91 S.Ct. at 852–53). *See also Berkman v. City of New York,* 705 F.2d 584 (2d Cir.1983) (court has broad but not unlimited power in fashioning remedy).

While Title VII, during the relevant period, did not permit an award of punitive damages, typically, remedies under Title VII have included retroactive promotion, back pay and attorneys' fees. *Brown v. General Services Administration,* 507 F.2d 1300, 1303 n. 4 (2d Cir.1974), *aff'd,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). *See e.g., Barbano,* 922 F.2d at 146 (affirming award of back pay, prejudgment interest and attorneys' fee and denial of injunction to hire); *Clarke v. Frank,* 960 F.2d 1146 (2d Cir.1992) (awarding back pay, prejudgment interest and attorneys' fees).

The statute provides that

> Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g).

In *Frank,* the Second Circuit determined that in order to calculate the appropriate award for back pay "the court must first ascertain the time period of the employer's liability. An employee is generally entitled to back pay from the date of [her] wrongful termination to the date the discrimination is rectified." *Frank,* 960 F.2d at 1151 (*citing EEOC v. Enterprise Ass'n Steamfitters Local No. 638 of U.A.,* 542 F.2d 579, 590 (2d Cir.1976), *cert. denied sub nom., Rios v. Enterprise Ass'n Steamfitters Local No. 638 of U.A.,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977)).

Under the Fair Labor Standards Act, a prevailing plaintiff is entitled to back pay, liquidated (double) damages and compensation for reasonable attorneys' fees and costs. 29 U.S.C. § 216(b). Remedies for violation of the ADEA are also provided for in 29 U.S.C. § 216. However, liquidated damages are only awarded in cases where there has been a willful violation of this act. 29 U.S.C. § 626.

"A violation is willful if 'the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1571 (2d Cir.1989) (quoting *Trans World Airlines v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) (citations omitted). "A showing of willfulness does not require proof of specific intent to violate the act nor may willfulness be established solely by evidence that the employer knew the ADEA was 'in the picture.'" *Id.* (quoting *Thurston,* 469 U.S. at 127, 105 S.Ct. at 625). A distinction must be made between "indifference to the ADEA and negligent attempts to comply with its dictates." *Benjamin v. United Merchants and Mfrs., Inc.,* 873 F.2d 41, 43 (2d Cir.1989).

> An employer acting with indifference is one who acts without interest or concern for its employees' rights under the ADEA at the time it decides to discharge an employee; that is, without making any reasonable effort to determine whether the decision to discharge violates the law. When there is evidence in the record that the employer acted reasonably and in good faith—even though it later turns out that employment termination violated the ADEA—double damages are not warranted. Were the rule otherwise, every ADEA violation would trigger liquidated damages, and Congress' purpose in creating a two-tiered structure of liability would thereby be contravened.

*Id.* (citing *Thurston,* 469 U.S. at 128, 105 S.Ct. at 625). The court concludes that Vassar's violation of the ADEA was willful because in a disparate treatment case such as this, the employer's action was taken *because*

*of* an impermissible factor and was not the result of "negligence, mistake, or other innocent reason." *Heublein,* 645 F.2d at 131 n. 6. In any event, even without a finding of willfulness, plaintiff is entitled to liquidated damages under the Equal Pay Act which does not require a showing of willfulness.

Plaintiff, here, originally sought to be reinstated as a member of the Vassar faculty as an Associate Professor of Biology with tenure at a salary equal to that of Dr. Suter from 1986 forward. It is unclear to the court whether Dr. Fisher still seeks reinstatement due to her change in career and, therefore, the court requests that plaintiff indicate her present feelings on this issue. She seeks back pay in an amount equal to the salary and benefits of Dr. Suter, plus prejudgment interest on the unpaid balance of the amount owed. Plaintiff also seeks to recover her attorneys' fees and costs.

Having proven her case on the grounds of sex discrimination in violation of Title VII, age discrimination in violation of the ADEA and salary discrimination in violation of the Equal Pay Act, the court finds that Dr. Fisher is entitled to recover back pay and prejudgment interest on that amount, less any amounts earned during the period 1986 when she was discharged until the present. She is also entitled to recover double damages under the Equal Pay Act and the ADEA. As plaintiff is entitled to only *one* monetary recovery, plaintiff is required to indicate under which theory she desires to recover.

Plaintiff is also entitled to recover attorneys' fees and costs. A separate hearing will be held on the matter of attorneys' fees, after plaintiff's attorney has filed the required affidavit and has otherwise complied with the Second Circuit's requirements for recovering such fees, to determine the amount of attorney's fees to be awarded. Submit order on thirty days notice.

## ORDER AND JUDGMENT

In accordance with the court's Findings of Fact and Conclusions of Law filed May 16, 1994 and in accordance with the court's findings made at the June 27, 1994 hearing on the issue of the amount of damages to be awarded to Plaintiff as well as the issue of the reinstatement of Plaintiff to the position of Associate Professor with tenure at Vassar College, it is ordered that:

a. Plaintiff recover from Defendant pursuant to her claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000–e *et seq.* and concurrently under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, a sum which is the difference between the income received by Plaintiff during the period from July 1, 1986 to June 30, 1994, and the average salary of an Associate Professor in the Biology Department at Vassar, which is the sum of $256,653. Since the court has found that Defendant acted wilfully, and Plaintiff has elected to recover under the ADEA, the amount is doubled and Plaintiff shall recover the total sum under the ADEA of $513,306.

b. Plaintiff recover from Defendant as damages pursuant to her claim of salary discrimination on account of her sex under provisions of the Equal Pay Act, 29 U.S.C. § 206(d), for the period July 1, 1983 through and including June 30, 1986, the sum of $8,265.00 which is equal to the difference between the salary Plaintiff earned and the salary Dr. Robert Suter (a male performing similar functions to those of Plaintiff at Vassar) earned during that period. The court then adds an equal sum as liquidated damages as provided by the Equal Pay Act so that the total damages in this category is $16,530 as of June 30, 1986.

c. Thus, the aggregate money judgment due Plaintiff is the sum of $529,836.00.

d. It is further ordered that Defendant pay the sum of $79,969.12 into the Teacher's Annuity Funds (TIAA–CREF), in Plaintiff's behalf, which is equal to the average of the additional amounts paid into these Funds on behalf of an Associate Professor in the Biology Department at Vassar College.

e. It is further ordered that Defendant pay the sum of $17,067 (being 6.65 percent of the difference between the income received by Dr. Fisher and the average income of an Associate Professor in the Vassar Biology Department during the period July 1, 1986 through June 30, 1994) into the Social Security Fund in Plaintiff's behalf.

f. Finally, the court orders that Plaintiff be restored to the faculty of the Vassar Biology Department for a period of two years, commencing with the Fall Term of 1994, to the rank of Associate Professor with tenure, at a salary equal to the average salary of an Associate Professor in the Biology Department at Vassar. She should be allowed a period of six months in which to reestablish her laboratory at Vassar. She is to be allowed to teach an introductory or lower level course commencing in the Spring Term of 1995 and be given the remainder of the time to bring her skills in her area of expertise up to date. At the end of the two year period, Plaintiff shall be evaluated by Defendant for retention and promotion to the Full Professorship track.

g. Defendant is enjoined from retaliating in any way against Plaintiff for any reason on account of this action.

h. This court retains jurisdiction over this action to insure compliance with this Order.

i. The court amends its Findings of Fact and Conclusions of Law of May 16, 1994 to include the following:

1) The court finds that the policy of discriminating against married women at Vassar College has changed and, presently, married women are hired and retained in the hard sciences departments. However, this policy change occurred after 1986, the year Plaintiff was denied tenure and after she filed her complaint with the New York State Human Rights Commission. Injunctive relief as to the policy under attack here is, therefore, not warranted at this time.

SO ORDERED.